GLADYS FEIGENSPAN, Respondent, v. WILLIAM PENCE, ALBERT PENCE, H. W. PENCE, CARL PENCE, CLYDE PENCE, S. W. PENCE, SUSAN HUDSON, MOLLIE VANOSDOL, EVA LENA SYMMONDS, ESTELLE CROZIER, J. C. RICE, OPAL FRIZZELL, JOHN W. RICE and VELMA A. WOERNER, Appellants.—No. 38257.—168 S. W. (2d) 1074.

Division One, March 2, 1943.

*Morris E. Osburn* for appellants.

*Walter M. Hilbert* and *H. S. Rouse* for respondent.

CLARK, J.—Suit for specific performance of an oral agreement to convey real estate in consideration of the performance of personal services. The decree was for plaintiff divesting title from defendants and vesting fee simple title in plaintiff. Defendants appeal.

*The pleadings* The petition alleged that on the —— day of ——, 1938, J. C. Pence and his wife, Amelia Pence, who was an aunt of this plaintiff, "entered into a contract and agreement with plaintiff, that if she would nurse and care for Amelia Pence during her lifetime, and J. C. Pence during his lifetime whenever called upon to render such service that the survivor of the said J. C. Pence and Amelia Pence would convey to this plaintiff the real estate hereinafter described," the real estate described being a 10 acre tract and a one-half interest in a 220 acre tract. The petition further alleged that Amelia Pence died on the —— day of August, 1939; that J. C. Pence died intestate January 28, 1940, leaving defendants as his only heirs; that plaintiff fully performed the contract on her part; that, after the death of Amelia Pence, in August, 1939, J. C. Pence executed and acknowledged warranty deeds conveying the described real estate to plaintiff, but failed to deliver the deeds; That plaintiff has no adequate remedy at law, etc.

Defendants filed a demurrer on the ground that the petition failed to state a cause of action, which demurrer was overruled. Defendants then filed answer admitting the deaths of J. C. Pence and Amelia Pence; that defendants are the only heirs of J. C. Pence and denying all other allegations of the petition. Then the answer set up that if plaintiff "ever rendered any services for J. C. Pence or Amelia Pence after the date of the alleged contract such services covered a short period of time, and the value thereof, if they were not rendered gratuitously, can easily be determined in dollars and cents, and adequate relief given at law, and that it would be unconscionable to enforce said alleged contract."

*The evidence* Plaintiff's evidence was that J. C. Pence was the second husband of Amelia. They lived at Steffenville, Missouri. They had no children. She was 72 years old at her death in 1939 and he was 64 when he died in 1940. Plaintiff lived with her parents at Lewiston, about 12 miles from the Pence home.

Defendants' counsel made timely objection to any evidence tending to prove an oral agreement because in violation of the Statute of Frauds.

Yetta Feigenspan (mother of plaintiff and sister of Amelia Pence), testified to a conversation at the Pence home in June, 1938,

at which were present: the witness, Gladys Feigenspan (the plaintiff), Alta Doscher and her husband, Arthur Doscher, (Alta being a daughter of the witness and sister of plaintiff), and Mr. and Mrs. Pence; that "Mr. Pence said he would like to have a contract and agreement with the girls, Alta and Gladys, that they would nurse and care for Amelia during lifetime, whenever they was called on, . . . and take care of him, nurse him and care for him through his lifetime, whenever they were called upon . . . he would deed Gladys the home place where they lived (10 acres) and give Alta and Gladys the Wolters place; (220 acres); that Mrs. Pence agreed to that and the girls also said they would." This witness further testified that two or three days after the death of Mrs. Pence, J. C. Pence said the girls (plaintiff and her sister) "had always did for them," (Mr. and Mrs. Pence), that he didn't see how they could have got along without them and they had taken lots of responsibility off of Amelia. Witness said that in December, 1939, J. C. Pence, while visiting in her home, said "they come up and did everything they agreed to do, now I am going to do for them,—I made two deeds to Gladys and one to Alta—these deeds will be turned right over to them. They won't have no trouble at all." On cross-examination, this witness said: that at the time of the conversation in June, 1938, plaintiff was living with her parents; that on August 22, 1938, plaintiff entered a business college in Illinois and continued as a student until November 10, 1939; that shortly thereafter she procured employment at Macon, Missouri, and continued in that employment until after the death of Mr. Pence; that Mr. Pence desired her to go to school; that she was not at the Pence home either when Mrs. Pence died or when Mr. Pence died; that she came there shortly after the death of Mrs. Pence and stayed three days; that while attending school and while employed at Macon she would frequently come home on week-ends and would often visit the Pence home; that after the date of the alleged contract with plaintiff, Mr. Pence kept a nurse employed at his home much of the time and also during practically all of the time kept a woman employed to do the housework; that most of the services rendered by plaintiff were rendered prior to the date of the contract; that she didn't do much after that because they didn't call on her; that when she was at the Pence home plaintiff would help "care" for Mr. or Mrs. Pence "like anyone would do," but the witness did not specify any particular service performed by plaintiff.

Over the objection of defendants'.counsel that it was outside the pleadings, and after plaintiff's counsel had stated he expected to prove that most of the Pence property was held by a joint title, Mrs. Feigenspan was permitted to testify that Mr. and Mrs. Pence owned their property jointly.

Alta Doscher (sister of the plaintiff) was offered as a witness for plaintiff. Defendants' counsel objected to her testimony as to

the agreement between the plaintiff and Mr. and Mrs. Pence on the ground that "the witness is a party to that agreement and the Pences with whom it is alleged to have been made are dead." This objection was overruled and the witness corroborated the testimony of her mother, Mrs. Feigenspan, as to the conversation with the Pences in June, 1938. She also said the plaintiff performed services for the Pences within the year preceding the agreement of June, 1938, "when they would call for her to come down and take care of her, she would; if the housecleaning needed to be taken care of or anything to that effect needed to be done, she would do it." That the plaintiff spent most of one summer at the Pence home. That after the plaintiff went to school "whenever they called for her she would go down and do what they wanted her to do." That this occurred several times, "I don't know exactly as I saw her nursing, but she would take care of her and do what she could for her."

Arthur Doscher (husband of Alta Doscher) testified to the agreement of June, 1938, and also to the later conversation at the Pence home after the death of Mrs. Pence. He also said that plaintiff spent most of one summer at the Pence home before the agreement, that several times after the agreement was made he took Gladys and Alta to the Pence home; that plaintiff would help with the housework or maybe stay a day or two; never saw plaintiff do any nursing; "neither one of them wanted her to stop school to come down there and take care of them;" after the death of Mrs. Pence "Gladys and Mrs. Feigenspan went down there and stayed three days, but because she had a job they didn't want to take her away from her job."

Casper Steffen told of a conversation with Mr. Pence in which the latter stated he wanted to give Gladys the home place and to give Gladys and Alta the place over by Monticello, that he had agreed to; also that he wanted to give Johnny Bell an eighty over east of Steffenville. Witness saw Gladys and Alta at the Pence home, but never saw them do any nursing.

E. O. McCracken, administrator of the estate of J. C. Pence, produced some warranty deeds which were received in evidence over the objection of defendants. These deeds were found in the box of Mr. Pence after his death and were never delivered or recorded. They were signed by him and acknowledged before a notary on October 2, 1939. One of them for a consideration of "one dollar, care, love and affection" purported to convey a 10 acre tract of land to Gladys Feigenspan (plaintiff); the other for a consideration of one dollar purported to convey a 220 acre tract to Gladys Feigenspan and Alta Doscher.

Dan Crist testified that Mr. Pence told him he had made arrangements to give the Wolters farm to Gladys and Alta, that he had agreed to convey it to them.

Mrs. Della Bell said that after the death of Mrs. Pence, Mr. Pence said he had a contract with Alta and Gladys for services. John Bell

(husband of Della) said substantially the same. These witnesses lived on one of the Pence farms and were in his home frequently, but less often after the death of Mrs. Pence. Neither could remember seeing plaintiff at the Pence home after she started to business school. John Bell said he had a similar suit pending to recover the 80 acre tract where he resides.

Mrs. Dora Hudnut was employed as a nurse at the Pence home from June 2, 1938, until after the funeral of Mrs. Pence. Mrs. Pence told her they had plans to leave Gladys the place where they lived and the farm near Monticello to the two girls. Mr. Pence was present a time or two when this statement was made. She saw the two girls there a number of times; they would do "anything that needed to be done, about the house or driving a car, they did drive Mr. Pence places a time or two." During this time they had a woman employed who did all the housework, "unless some of the folks were there . . . any of the folks that were there always helped." She remembered seeing plaintiff dusting and working around the house. When asked if plaintiff assisted in nursing, she said: "Oh, she would bring in some water maybe or something like that."

Dr. W. B. Isom was the Pence family doctor from January, 1937, until the death of Mr. Pence. After the death of Mrs. Pence, Mr. Pence stated that he wanted to take care of plaintiff and asked witness if making deeds would be legal. Usually a nurse and a housekeeper were employed at the Pence home; he saw plaintiff there a few times, from four to six times; did not recall seeing her perform any service, but believed that some time in 1938 Gladys went with him to take Mrs. Pence to a hospital at Kirksville.

Mrs. Opal Carter was the only witness for defendants. She was employed as a cook and housekeeper at the Pence home from June 19, 1939, until four days after the death of Mrs. Pence. She saw plaintiff there a few times, "I don't know that she did anything more than assisted . . . wipe the dishes or something like that. She just came to visit her aunt."

*The law* This being a suit in equity we review the evidence and make our own findings of fact, giving due deference to the conclusions of the chancellor.

The Statute of Frauds, Section 3354, Revised Statutes of Missouri, 1939, [Mo. R. S. A., p. 555] provides, "No action shall be brought . . . upon any contract made for the sale of lands, . . . unless the agreement upon which the action shall be brought, . . . shall be in writing," etc.

To prevent gross injustice in particular cases, courts of equity from time to time have granted exceptions to the positive terms of the statute and have enforced oral contracts for the conveyance of real estate, under certain circumstances and according to definite rules. This court has often stated those rules, and the reasons for them,

perhaps never more clearly than in the case of Walker v. Bohannan, 243 Mo. 119, l. c. 135, 137, 147 S. W. 1024, as follows:

"The rules cover many phases; i. e.: (1) The alleged oral contract must be clear, explicit and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged, was in fact made and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) the work constituting performance must be such as is referable solely to the contract sought to be enforced, and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand but not upon the other would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; and (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed, made before the acts of performance relied upon were had.

"There may be other phases of the rule adhered to by the courts in cases of this character, but the foregoing are clearly within a long line of Missouri cases. The more recent ones are: Forrister v. Sullivan, 231 Mo. 345; Collins v. Harrell, 219 Mo. 279; Wales v. Holden, 209 Mo. 552; Kirk v. Middlebrook, 201 Mo. 245. Other cases of like tenor are found cited and discussed in the foregoing. Suffice it to say that they all indicate that the courts are slow to enforce contracts of the character we have here.

"It is only where the very justice of the thing is so clear, that the refusal of relief would itself amount to a deep seated wrong and fraud upon the party, that courts of equity will act, and as said before this is right. The fickleness of land titles should be averted. The wholesale enforcement of such contracts would bring more absolute wrongs, than the absolute denial of relief in all such cases. It should therefore be with discerning eye and ear that the chancellor appealed to, should proceed. His single purpose should be the prevention of a real fraud, rather than an imaginary one. His decree should protect substance, rather than shadow, and the evidence to support his decree should point to a real and actual fraud as the outgrowth of a failure to enforce a clear, certain, reasonable and specific contract. By this we mean, a contract between the parties, not a contract made for the parties by loose declarations gathered together after death has sealed the lips."

In the instant case, although the proof rests mainly on testimony of witnesses having an apparent interest in plaintiff's recovery, we are not disposed to disagree with the chancellor's conclusion that some kind of a contract or agreement was entered into. Under the evidence that contract was that plaintiff would "nurse and care for" Mr. and Mrs. Pence during their respective lives, when called upon, and in payment would receive a ten acre tract of land and a half interest in a 220 acre tract. There being no question of mental incapacity, fraud or undue influence, ▮▮▮▮ had this contract been in compliance with the statute the adequacy of the consideration or the fairness of the terms would not be of so great importance. But, as the contract was not in compliance with the statute, it was incumbent upon plaintiff to make a showing of the fairness of the terms and adequacy of the consideration, as well as substantial performance on her part. This she failed to do. There was no proof as to the value of the real estate or as to the value of the services rendered by plaintiff. In fact, proof that plaintiff rendered any services under the contract was meager and indefinite. There was no proof that plaintiff did any nursing. Mrs. Feigenspan, plaintiff's mother, said that most of plaintiff's services were rendered before the date of the contract. She said that plaintiff would "care" for them "like anyone else would do." The testimony of Alta Doscher, sister of plaintiff and jointly interested with her in winning this suit, is substantially the same as that of Mrs. Feigenspan, except that she mentions housecleaning done by plaintiff on one occasion. Arthur Doscher also mentions housecleaning done by plaintiff. Dora Hudnut said that when plaintiff was there she would do anything that needed to be done about the house, that any of the folks would help. To sum the matter up, the proof shows that plaintiff, on the infrequent occasions when she was in the Pence home, performed acts of service "like anyone else would do," but there is no proof that she performed any unusual or arduous services which cannot be adequately compensated in money. In determining the fairness of the contract we must to some extent consider the situation of the parties at the time the contract was made. At that time, of course, they did not know how long either Mr. or Mrs. Pence would live, but it is reasonable to assume that they then knew that plaintiff would not often be called on to render service. At and prior to the date of the contract Mr. Pence kept both a nurse and a housekeeper constantly employed, and it was understood by Mr. and Mrs. Pence and by the plaintiff that plaintiff was to go to school in another state. After plaintiff finished her course at business school and obtained employment, Mr. Pence did not desire her to lose time from her work. There was some evidence that prior to the contract plaintiff had devoted some time to "caring" for Mr. and Mrs. Pence. If such service was performed under circumstances entitling her to be paid therefor, the same could be considered as a part of the basis of the contract. Even so, the evidence is so vague

and indefinite as to the extent and value of the services and the value of the real estate that we cannot say that the oral contract meets the test of necessary fairness and adequacy to permit it to be excepted from the statute.

A case exactly in point is Sportsman v. Halstead, 347 Mo. 286, 147 S. W. (2d) 447. There the plaintiffs sought specific performance of an oral contract with one P. B. Smith, deceased, whereby for their services he agreed to leave them all the property owned by him at his death. The opinion approves the rules laid down in Walker v. Bohannan, supra; finds that the proof established the terms of the contract and performance by plaintiffs as required by those rules; but holds that the record failed to show what land belonged to deceased so we could put a value on it. Then the opinion says:

"We feel unable to decree authoritatively, in view of these facts and others, whether the contract was fair and conscionable and the respondents have no adequate remedy at law—in other words, whether they are entitled to specific performance. We are further impelled to that conclusion by the absence of important facts. All this we say though conceding the respondents have proven by the requisite weight of evidence that the oral contract entitled them to whatever property P. B. Smith left at his death, and that there are reasons for thinking he might have wanted or been willing to make such a contract. Parties who have ignored the statute of frauds cannot exact the pound of flesh although their oral contract awards it to them. Specific performance will be granted only where the very justice of the thing calls for it. This phase of the doctrine applying to suits of the present character is ably discussed in Selle v. Selle, supra, 337 Mo. loc. cit. 1239-1244, 88 S. W. (2d) loc. cit. 880-884." ·

In Selle v. Selle, 337 Mo. 1234, 88 S. W. (2d) 877, the cases are extensively reviewed. We denied specific performance because the evidence failed to show that the contract was fair when made and failed to show that plaintiff could not be adequately compensated by a money judgment. We reached the same conclusion in Dieckmann v. Madden, 349 Mo. 312, 160 S. W. (2d) 724. ■■■■ [See, also, Stibal v. Nation (Mo.), 98 S. W. (2d) 724; Herman v. Madden, 349 Mo. 447, 162 S. W. (2d) 268.]

Respondent cites a number of cases in which oral contracts for the devise or conveyance of land have been enforced, but each of them is clearly distinguishable from the instant case on the facts considered.

We hold that the evidence fails to establish plaintiff's rights to specific performance of her oral contract, because of failure to prove its fairness and the adequacy of the consideration.

■ We must also sustain appellants' contention that the petition is insufficient for failure to allege that defendants own the real estate sought to be recovered, or any interest therein. "To state a cause of action for specific performance of a verbal contract to convey land, the

petition should state that the promisor owned the land at the time the contract was made or some time before his death or that defendants own it now." Heron v. Peisch, 240 Mo. 221, 144 S. W. 414. [See, also, Coal & Iron Co. v. Long, 231 Mo. 605, 1. c. 610, 133 S. W. 35.] Nor did defendants waive the defect in the petition by answering over after their demurrer was overruled. Baugher v. Gamble Const. Co., 324 Mo. 1233, 26 S. W. (2d) 946. Oral evidence as to the ownership of the land was received, but as this went in over the defendants' objection the petition will not be considered as amended to conform to the evidence. Lee v. St. Louis Pub. Serv. Co., 337 Mo. 1169, 88 S. W. (2d) 337. Nor can the petition be amended in this court. O'Toole v. Loewenstein, 177 Mo. App. 662, 160 S. W. 1016.

Under the pleadings and the evidence plaintiff is not entitled to specific performance of her contract; yet the proof shows that she had a contract with J. C. Pence and that she performed some services under that contract. The evidence further shows that Pence intended to compensate her for those services. This is indicated not only by the statements made by him, but also by the deeds which he executed but failed to deliver. One of those deeds, that describing the 10 acre tract, purported to be for a consideration of "one dollar, *care*, love and affection." Plaintiff should not be deprived of all relief, for equity having become possessed of the case will not stop short of complete justice. Under similar circumstances, in Sportsman v. Halstead, 347 Mo. 286, 147 S. W. (2d) 1. c. 457, we remanded for further proceedings to determine whether a case could be made for specific performance or for a money judgment with a lien on the real estate; and in Selle v. Selle, 337 Mo. 1234, 88 S. W. (2d) 1. c. 883, we reversed a judgment for specific performance and remanded for proof of the reasonable value of the services to be secured by a lien on the land.

We feel that this case should not be reversed outright, but that the decree for specific performance should be reversed and the cause remanded to permit plaintiff to properly amend her petition and to make proof of such services for which she may be entitled to charge, and the value thereof, and to permit the court to render a money judgment for the proper amount to be secured by a lien on such of the real estate described in the petition as may be alleged and proved to have been owned by J. C. Pence at his death.

Accordingly, it is so ordered. All concur.