FLOYD JESSE and NORA JESSE, Plaintiffs-Respondents, v. W. P. O'NEAL, Defendant-Appellant, No. 43403—261 S. W. (2d) 88.

Division One, September 14, 1953.

Motion for Rehearing Overruled and Opinion Modified on Court's Own Motion, October 12, 1953.

*Thomas G. Woolsey* and *Leon P. Embry* for appellant.

*Harry H. Kay* for respondents.

336

COIL, C.—Plaintiffs-respondents, the son-in-law and daughter of defendant-appellant, alleged that in 1939 defendant, to induce them to remain as tenants on his farm, proposed that if they "would remain on said farm as tenants and in addition would assist the defendant and his wife in taking care of their livestock and the farm on which they [defendant and his wife] lived and would render to defendant and his wife such services as they might require during the remainder of their lives, he, the defendant, ▮▮▮ would convey to plaintiffs the following described real estate in Morgan County, * * *''; that plaintiffs accepted the proposal and had performed the agreement to the time of filing the petition; that defendant had con-veyed some and had attempted to convey other real property including that here involved, for the purpose of "putting the same out of the reach of the plaintiffs and for the purpose of cheating and defrauding plaintiffs out of their twelve years of labor and services in his behalf" and so "that upon his death he will have no property or estate out of which plaintiffs could realize damages for the breach of his contract with them''; that defendant had denied that he ever had such a contract with plaintiffs and had refused to permit them to further perform, though they were able and willing to so do. The prayer was: "* * * that the court declare the rights and duties of plaintiffs and defendant under the aforesaid contract * * * and declare that said contract is in full force and effect and that if the plaintiffs continue to perform services in accordance with their obligations under said contract, the defendant, his executors, administrators and heirs, will be obligated to convey to plaintiffs said real estate; and to adjudge and declare that defendant cannot repudiate said contract nor refuse to permit plaintiffs to carry out their part of same, and that plaintiffs have an equitable lien against said real estate; and that the court grant such other and further declaratory judgment and relief as may be lawful and proper in the premises.''

Defendant's answer admitted the tenancy as alleged and that plaintiffs had rendered some services to defendant and his wife; alleged that such services were either gratuitous or that defendant had paid for them; and denied that defendant at any time entered into a contract with plaintiffs obligating him to convey the described land.

The trial court found that the alleged contract was made; that plaintiffs had performed thereunder in so far as defendant would permit; that defendant had denied that he ever entered into such contract, and adjudged, "* * * that if the plaintiffs continue to perform the contract entered into with the defendant in the year 1939 so far as defendant will permit them to perform same, they will be entitled to the real estate above described and that plaintiffs have the equitable title to said real estate subject to being defeated only by their refusal to carry out the contract above mentioned and that the defendant is obligated under said contract to make such provisions

as will insure that the plaintiffs receive the legal title to said real estate upon his death.''.

On this appeal the parties have briefed and argued three issues, viz., whether the petition stated a claim upon which relief could be granted, i.e., whether any relief could be granted pursuant to the Declaratory Judgments Act (Ch. 527, RSMo 1949, V.A.M.S.) ; whether the judgment was supported by the evidence; and whether, in any event, the judgment of the trial court is erroneous in the respect that it places the equitable title in plaintiffs.

This case differs from the usual one wherein, after a promisor's death, it is alleged that an oral contract (similar to the one here) was entered into, had been fully performed by the promisee, and equitable relief in the nature of specific performance is sought. Here, promisor-defendant is living and full performance by promisees-plaintiffs has not been accomplished. We shall assume, without deciding, that the evidence established the agreement as alleged, that the agreement was clear, definite and complete, was fair and conscionable and based upon an adequate consideration, and that, to date of trial, had been performed by plaintiffs by acts solely referable thereto.

In our view, if plaintiffs are entitled to the equitable relief awarded below, their claim may be considered a suit in equity and no question of relief by declaratory judgment is involved. If, on the contrary, plaintiffs are not entitled to the relief granted, the question remains whether they are entitled to declaratory relief. Of course, it is proper to seek both declaratory ▆▆ and coercive relief under our Declaratory Judgments Act. Union National Bank v. Jessell, 358 Mo. 467, 474, 215 S.W. 2d 474, 476[2-4].

▆▆ We therefore first consider whether plaintiffs' proof called for the equitable relief awarded below, in effect a conditional decree in the nature of specific performance. We have found only one case in this state involving a similar suit brought during the lifetime of the promisor. Gupton v. Gupton, 47 Mo. 37, was an action for specific performance, or in the alternative, compensation for breach, of a contract to make a will in favor of plaintiff. This case supports the conclusion that, under certain circumstances, proper equitable relief may be granted during the lifetime of a promisor and before full performance by the promisee.

An annotation on ''Remedies During Promisor's Lifetime on Contract to Convey or Will Property at Death in Consideration of Support or Services'' contains this summary (7 A.L.R. 2d 1166, 1168-1169) : ''The courts are not uniform in their attitude toward contracts of the character covered by the annotation, particularly with respect to relief by way of specific performance. One of the greatest obstacles to granting specific performance of such contracts is that they ordinarily involve personal services and lack mutuality of obligation and remedy. Thus, as pointed out in Watson v. Hobson (1948) 401 Ill 191, 81 NE2d

885, 7 ALR2d 1156, the promisor cannot require the promisee to perform the services by specific performance if the promisee should refuse, nor can the promisor be compelled to live with the promisee for the remainder of her life if she does not desire to do so; so also the promisee may die before the promisor and the continued care to which the promisor would be entitled might therefore be incapable of fulfilment.

"However, while it appears that the numerical majority of the cases, either by actual decision or by dictum, deny the remedy of specific performance to enforce, during the lifetime of the promisor, contracts to convey or will property at death in consideration of services or support, *it is also apparent that courts of equity will grant analogous relief by way of injunction or the creation of a trust to protect the promisee where there has been substantial performance on his part and the promisor has repudiated the contract and conveyed or attempted to convey the promised property to others taking with knowledge of the promisee's rights, and where the hardship or fraud upon the promisee is such as to warrant equitable relief, the particular remedy being dependant upon the circumstances of each case.*" (Emphasis ours.)

And at page 1171 it is said: "In the majority of the cases it has been held or stated that contracts to devise or convey property at death in consideration of services rendered to, or support of, the promisor, are not specifically enforceable during the lifetime of the promisor, usually on the grounds that such contracts are executory until the death of the promisor, involve the rendition of personal services, and lack mutuality of obligation and remedy."

One view as to relief in the nature of specific performance or analogous relief during the lifetime of the promisor is thus expressed in Martin v. Martin, Ct. of Civ. App., Tex., 230 S. W. 2d 547, 551: "When parties enter into a contract such as the one here involved, they must realize that in order for such a contract to be carried to completion the parties must remain friendly and there must be cordial and considerate relations between them. They must know that if their relations become unfriendly and the situation becomes intolerable the contract cannot be carried out. And, furthermore that any contract for personal services cannot be specifically performed by the courts, and therefore if either party to the contract should see fit to breach it the only remedy would be a suit for damages for the breach thereof." (But in Missouri, if the Statute of Frauds is invoked, unless a plaintiff is entitled to specific performance, he is not entitled to damages for breach of an oral contract to convey or devise real estate. Jones v. Linder, Mo. Sup., 247 S. W. 2d 817, 825[12].)

On the other hand, the view that equitable relief analogous to specific performance may be granted, when the facts require it, during the lifetime of the promisor is illustrated by the synopsis of an Iowa case in the annotation in 7 A.L.R. 2d 1166, 1179: "So, where

defendant induced plaintiff, his daughter, to leave her home in the country to go to live with defendant in town and care for him in a house purchased by him, which he promised to give her in return for her services, but thereafter defendant left plaintiff and deeded the house to others, the court, in Newman v. French (1908) 138 Iowa 482, 116 NW 468, 18 LRA NS 218, 128 Am St Rep 212, while denying specific enforcement of the contract on the ground of lack of mutuality of obligation, held that plaintiff was entitled to a decree restraining defendant from conveying or attempting to convey the premises, and from interfering with plaintiff's possession and enjoyment thereof, so long as plaintiff continued to perform or should be ready and able to perform the contract on her part, and providing that the title taken by the grantees of defendant should be subject to the right of plaintiff to have the fee simple title to the property conveyed to her when her obligations under the contract should have been fully performed.''

Consideration of the cases, including Gupton v. Gupton, supra, convinces us that the proper rule is: relief in the nature of or analogous to specific performance (i.e., protective relief) will not be granted during the promisor's lifetime and before full performance by the promisee, except where the facts establish a situation imperatively calling for protective equitable relief; and in a proper case such relief will not be denied simply because the promisor is alive and the promisee has not fully performed. What equitable relief should be granted must, of course, depend upon the particular facts; in short, upon the equities appearing. But the equities on behalf of the party seeking relief must justify such relief and be so strong that denial of protective relief would presently and surely amount to deep-seated injustice.

We think the instant case is not one wherein the facts call for such relief. See again and compare Gupton v. Gupton, supra. This conclusion is sound for at least two reasons. First, there was no substantial evidence tending to prove plaintiffs' allegations that defendant had threatened to convey his property to cheat and defraud plaintiffs, had conveyed certain real estate, and was attempting to evade his contract by disposing of all of his real estate. Plaintiffs' only evidence in this respect was the following question and answer in the testimony of plaintiff, Floyd Jesse: ''Q. Did information come to you that he was trying to sell the place? A. They did.'' Defendant testified that he had not sold any of the three tracts of land which he owned; that he had tried to sell one 80-acre tract (worth about $1,500 and not here involved) which he had offered to his various children, including plaintiffs, but that he had not received a sufficient offer; that the tract here involved was worth $8,000 to $10,000 and that the home place was worth about $6,000 or $7,000; that he said at one time '' 'I can't take care of the farms anymore. Might take a notion to sell

them someday,' and so I seen Tillman Lehman and told him that if I did take a notion to sell the farm would he be interested in buying. And that is all the offering to sell that farm I ever done.'' One of defendant's witnesses testified that she asked him if he would sell the home place; that she did not buy it; that she had never tried to buy the one here involved. Defendant's son, Barney O'Neal, in answer to the question ''Didn't you go to tell somebody that your father wanted to sell the place the Jesses are on?'' said ''Yes, and dad said he didn't know whether he could take care of all the stuff and he had a notion to sell the farm. And Tillman's grandparents lived on it and I said why don't you give Tillman a chance on it. And he said sometime if you see him you ask Tillman about it and I asked Tillman and he didn't want it, and dad never said anything about it and I never.'' An abstracter said that the records showed no conveyance affecting defendant's three farms in the last 25 or 30 years.

(And plaintiffs' proof showed that in their view they are still performing under the agreement to the extent permitted by defendant. This is not a situation wherein defendant has admitted the agreement and repudiated it by making it impossible for plaintiffs to continue performance. Defendant still owns the land, the relation of landlord and tenant continues between defendant and plaintiffs, and there was no showing what, if any, disposition of the farm was provided for in defendant's present will, although there was proof that defendant had executed a will at a comparatively recent date.)

The foregoing evidence does not tend to prove that defendant had conveyed, attempted to convey, or had threatened to convey his property in fraud, of whatever rights, present or future, plaintiffs have or may have.

Second, the acts of performance to the date of trial relied upon by plaintiffs were not such as to demonstrate that plaintiffs cannot be adequately compensated in money for their reasonable value. In so holding, we do not prejudge an action for relief in the nature of specific performance which might be brought by plaintiffs after defendant's death and after plaintiffs' full performance or tender thereof. We cannot now know whether plaintiffs' future acts in alleged performance of the alleged agreement would be such, taken together with the acts performed to the date of trial, as to call for such relief.

But in determining whether instant plaintiffs are entitled to the relief awarded below, we examine the nature of the acts of performance relied upon to the date of trial. Defendant lived on the home place about 1½ miles from the farm rented to plaintiffs, who moved there in 1934 and continuously remained. According to plaintiffs, the crop rent agreement in effect prior to the 1939 alleged contract to convey became a part of the contract. Both plaintiffs testified that in 1939, after a bad crop, they were assured by Floyd Jesse's sister that plaintiff Floyd could earn one dollar an hour as a carpenter and plaintiff

Nora could earn five dollars a day if they moved to St. Louis; that they decided to move but were induced to stay by defendant's proposal above quoted. Their testimony was, however, that Floyd had done only rough carpentry in his spare time, that he had made no investigation as to his prospects for employment in St. Louis, and that his sister was not in any kind of business or position which furnished any apparent factual basis for her assurances to plaintiffs. The only fair inferences from this testimony are that plaintiffs' decision to leave the farm was prompted by a bad crop and that their financial future in St. Louis was entirely conjectural. Plaintiffs also said that, in 1944, Nora's cousin, living in California, visited them and urged them to move to that state because of good wages. They "just about made up our minds we would go" but again were urged to stay by defendant who repeated that he had promised them the place.

Plaintiffs said that the acts performed by them under the agreement to convey were these: Floyd cut wood (with the help of other of defendant's children at times); fed 8 to 15 head of cattle and a few hogs once a day during the two years immediately preceding trial (prior thereto, he only helped with the feeding as did other of defendant's children); took defendant and his wife to doctors' offices, stores, and other places (100 trips to various doctors and many other trips were made in a 1931 Ford owned by defendant which plaintiffs used under an agreement to rehabilitate and operate at their expense, although defendant thought he had given them the car in exchange for their services in taking him and his wife various places); took defendant fox hunting; visited the home place at first twice a week, later once a day and sometimes twice a day, to see if there were any chores to do; delivered defendant's share of the crop to him at the home place; "tried to help defendant and his wife with whatever needed done"; "when they wanted anything, they always told us what they wanted and we always tried to do it"; "sat up" with defendant's wife during her last illness. Nora made a trip to the home place almost every day; did "just most anything that had to be done. If mother was working at anything and I could assist her, I would help her"; took her mother to the store; did her mother's and defendant's laundry for the 10 years preceding trial (ever since Nora obtained a power machine); during her mother's illness went over every day to wash, iron, and help; she and her husband paid for the cattle feed for defendant's cattle; if her father and mother "were sick and needed anyone to stay with them and see they got the medicine and care and food, we did"; did some cooking for her parents but did not know how much. Both plaintiffs testified that others of defendant's children assisted at times in work at the home place and sometimes took defendant and his wife various places. Ennis O'Neal, defendant's son and plaintiffs' witness, testified that he and Floyd took care of the

cattle while his father was in the hospital at Boonville and that his father paid him (Ennis) $100 for so doing.

Defendant's wife died in October 1949. On November 11, 1949, defendant moved to plaintiffs' home and lived there until May 1950. During that time, Nora said they did for him "just what you would do for a parent under your roof. He eat at our table and I washed and ironed for him." In May 1950, defendant apparently returned to the home place, later visited others of his children and other relatives, returned to plaintiffs' home for a time, and thereafter has lived with his son Barney.

Defendant's testimony was to the effect that plaintiffs had done the same as the other children except that plaintiffs lived closer to the home place and thus did more. He said, "I don't think they done anymore than the other children would have done if they had been as close as they was * * * the other children didn't visit as much in our home because they weren't as close and because the Jesses were tending a crop." Barney O'Neal, defendant's son and witness, testified that plaintiffs had performed services for his father of the same kind and nature as had the other children; that Floyd had been more responsible for taking care of defendant's "stuff" than any of the rest because he lived closer to the home place.

As to improvements made by plaintiffs on the farm in question, Floyd said that he painted the house, helped do some roof work, plastered and papered several times, had the cistern fixed, and had wired the house for electricity. However, there was evidence that the wiring was done under a specific arrangement between defendant and Floyd in order to induce defendant to grant a right of way to an electric power company.

The foregoing testimony compels the conclusion that there was no clear showing the plaintiffs gave up anything by remaining as tenants on the farm instead of going to either St. Louis or California. There was no evidence from which any inference can be drawn that plaintiffs made any sacrifice, financially or otherwise, by remaining on the farm. Nor was there evidence from which it may be inferred that any improvements or repairs made by plaintiffs were of a type and nature the value of which could not be easily measured by money standards. Furthermore, the evidence does not disclose wherein plaintiffs' acts in taking care of defendant's livestock and in rendering services to defendant and his wife differed, if they did differ, from plaintiffs' actions prior to the alleged agreement to convey. In any event, the acts relied upon, as recounted above, were of such nature that plaintiffs may be adequately compensated for their reasonable value. In short, there is no showing that a failure to grant relief analogous to specific performance would result in a deep-seated wrong to plaintiffs.

Defendant has not relied upon the Statute of Frauds. He denied the alleged oral contract to convey but did not object to evidence re-

lating thereto. State ex rel. Place v. Bland, 353 Mo. 639, 651, 183 S.W. 2d 878, 886[8,9]. There is no dispute, however, that the contract relied upon was oral. And in this action, brought during the lifetime of the promisor, it is proper that we take into consideration the fact that the contract ▮▮▮ was oral in determining whether the equities of the situation imperatively call for present relief.

▮▮ Are plaintiffs entitled to any of the declaratory relief which they asked for under our Declaratory Judgments Act, supra? Our conclusion that they are not presently entitled to the relief granted by the trial court or to similar equitable relief, in effect answers this question in the circumstances disclosed by the facts in this particular case. Whether an enforceable claim will ever accrue, or whether plaintiffs will be entitled to relief when an enforceable claim has accrued under the alleged contract, are entirely speculative at this time. Plaintiffs may predecease defendant. They may decide not to attempt further performance under the alleged agreement. Their future acts of performance, or tender thereof, under the alleged agreement may be such as not to entitle them to relief in the nature of specific performance even after the death of the promisor. Defendant may convey or devise the farm to plaintiffs. The only present controversy between plaintiffs and defendant is the existence of the claimed oral agreement to convey which plaintiffs assert and defendant denies was made. If in fact there was a contract, there is no uncertainty as to its terms or their meaning. True, such a declaration might be convenient for plaintiffs; its effect would be to have determined in advance the fact that a contract was entered into and partial performance thereof had been made at a time when the testimony of all parties is available and thereby establish now some essential facts in their proof in a possible future coercive action. If, under some circumstances, a declaratory judgment may be entered to declare merely the existence of an oral contract, such a declaration would serve no useful purpose in this case.

The difficulty, as noted, is that we may not tell at this time whether any enforceable claim will ever accrue to plaintiffs under their alleged agreement. To now declare that a certain contract was entered into, that it was fair and conscionable, that it was based on an adequate consideration, that its terms were sufficiently definite, and that plaintiffs have performed to the time of trial would simply be a determination of one phase of possible future litigation, the occurrence of which is entirely speculative; a piecemeal trying of what is now only a claim possibly enforceable in futuro. The existence of the contract is of no importance now and will become important only if a subsequent action is brought and (even if established in that action) is supplemented by proof of other facts which would entitle plaintiffs to the relief sought in that action. And whether plaintiffs will ever need to establish the existence of the contract and their performance

344

thereunder is presently conjectural. An abstract declaration that the contract exists would, under the circumstances, serve no useful purpose in protecting any present legal right. We believe that there is no independent issue in controversy, or legal uncertainty existing, between the parties which we can say with relative certainty may be usefully settled by a present declaratory judgment. This being true, there is no controversy in existence ready for judicial decision. City of Camdenton v. Sho-me Power Corp., 361 Mo. 790, 237 S. W. 2d 94, 96[1,2].

Accordingly, the judgment is reversed with directions to dismiss plaintiffs' first amended petition without prejudice. *Van Osdol* and *Lozier, CC.,* concur.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the court. All the judges concur.