**Ruby TUCKWILLER, Plaintiff-Respondent,**

**v.**

**Marion TUCKWILLER, Executor of the Estate of Flora Metta Morrison, Deceased, and Davidson College, a Corporation of the State of North Carolina, Defendants-Appellants.**

**No. 51769.**

Supreme Court of Missouri, Division No. 1.

March 13, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied April 10, 1967.

As Modified on Court's Own Motion April 10, 1967.

James & Butterfield, A. Lamkin James, Marshall, for respondent.

Ike Skelton, Jr., W. R. Schelp, N. R. Bradley, Lexington, for defendant Davidson College.

William T. Bellamy, Jr., Marshall, for defendant Marion Tuckwiller.

Bradley, Skelton & Schelp, Lexington, of counsel.

WELBORN, Commissioner.

This is an appeal from a decree ordering specific performance of a contract to devise real estate. The residuary legatee to which the proceeds of the property would have passed under the owner's will and the executor have appealed.

At her death at the age of 73 years, on June 14, 1963, Flora Metta Morrison was the owner of a 160-acre farm in Saline County. The inventory value of the farm was $34,400.00. By her will, dated September 7, 1961, the farm and the remainder of the residuary estate of the decedent were to be converted into cash and the proceeds given to the trustees of Davidson College to establish a student loan fund in memory of the decedent's mother. By the will, John Tuckwiller, a nephew of the decedent and

the husband of the plaintiff, was given an option to purchase the farm at its appraised value. Ruby Tuckwiller, plaintiff below, based her action for specific performance upon a written contract with the decedent, entered into May 3, 1963, whereby plaintiff was to care for Mrs. Morrison during her lifetime, for which the farm was to be devised to plaintiff.

The Hudson family farm consisted of three separate tracts in the same general neighborhood. Since 1958, Flora Metta Morrison had owned the 160-acre tract here in question and her sister, Dr. Virginia O. Hudson, had owned a 140-acre tract and an 80-acre tract, called the home place on which the Hudson family home was located.

In November, 1958, John Tuckwiller and his family moved into the "home place" and operated the three farms on a rental basis. By the arrangement between John and Dr. Virginia Hudson, three rooms in the home place were reserved for the use of Doctor Hudson and Metta whenever they saw fit to make use of them.

Flora Metta Hudson was born at the home place. She attended Missouri Valley College, Central Missouri State College at Warrensburg and Columbia University, receiving master's degrees from the latter two. Around 1920, she married a Morrison whose name does not otherwise appear and she was not married at the time of her death. After her marriage, she taught in the Philippine Islands for some twenty years. In the 1940's, she went to New York and worked for the Red Cross and at Saks Fifth Avenue. After the Tuckwillers moved into the home place, she visited them two or three times per year. In 1961, the apartment building in which she lived in New York was demolished and she had no particular place of residence. She went to Paris in the fall and winter of 1961 and subsequently visited relatives in various parts of this country. She came to the home place in October, 1962, and stayed until just before Thanksgiving. She left and visited in Oklahoma, Arkansas, Texas and New Mexico before

returning to the home place in January, 1963.

Mrs. Morrison had Parkinson's disease, "a progressive relentless disease which progresses as time goes on, and it goes to the various stages from minimum involvement to complete involvement of the musculature." Mrs. Morrison had had the disease for two or three years and her condition was worse upon her return to the home place in January, 1963, than it had been on her previous visit. She went to New York for a few days in January, 1963, but did no further travelling after her return to the farm.

John Tuckwiller's wife, Ruby, had been employed at the State School in Marshall since February 1, 1960. In 1963, she was employed in the food service department at a salary of $206 per month. Ruby and Metta were quite congenial and Metta expressed frequent appreciation of the care and attention which she received from Ruby. Aware of the course of the disease from which she suffered, Mrs. Morrison was concerned about the prospect of her eventual disability and confinement in a nursing home for care. She began to urge Ruby to quit her job at the State School and to care for Mrs. Morrison in the home place the rest of her life. In April, 1963, Ruby did begin to use her accrued vacation time and remained at home, but she was unwilling at that time to forego her employment and undertake Mrs. Morrison's care.

On April 11, 1963, Mrs. Morrison had been quite dizzy, had staggered and fallen. When she fell again the following day, an ambulance was called and she was taken to the hospital at Marshall. There she was diagnosed as having suffered a cardio vascular accident (stroke) with a secondary diagnosis of Parkinsonism. There was evidence of some mental confusion during her hospitalization. According to her physician, she knew where she was, but did not know why she was there. She was discharged from the hospital on April 20. Upon an examination at a house call on May 2, her physician found Mrs. Morrison mentally clear. A lifelong friend whom Mrs. Morrison visited on the morning of May 3 stated that mentally "she was just as clear as a bell." As she left the friend's house, Mrs. Morrison remarked, "I'm not done for."

However, according to her physician Mrs. Morrison was aware that Parkinsonism was a "time consuming disease," which, "if [it] progresses far enough, [its victims] will become invalids, * * * depending one hundred percent on outside care." Upon her return from the hospital, Mrs. Morrison had talked further to Mrs. Tuckwiller about providing care for her. Mrs. Tuckwiller was reluctant to give up her job at which she worked regular hours for what she felt might involve several years of exacting care. However, on May 3, in the late afternoon and in the presence of plaintiff's husband, an agreement was reached which plaintiff put in writing as follows:

"My offer to Aunt Metta is as follows

"I will take care of her her lifetime; by that I mean provide her 3 meals per day—a good bed—do any possible act of nursing and provide her every pleasure possible.

"In exchange she will will me her (Corum) farm at her death keeping all money made from it during her life. She will maintain expense of her medicine."

The writing was signed by Mrs. Morrison at that time. On May 4, Mrs. Morrison went with the Tuckwillers to attend the marriage of their son in the vicinity of Warrensburg. Members of the family who observed her during the visit found Mrs. Morrison somewhat weakened physically but mentally keen and interested in the wedding and in visiting with relatives and friends in attendance.

On Monday morning, May 6, Mrs. Tuckwiller went to the State School and resigned her job. On the same morning, Mrs. Morrison called the attorney who had drawn her earlier will for an appointment to change

her will. An appointment was made for 10:00 A.M., May 7. However, shortly after noon on May 6, Mrs. Morrison again fainted and fell at the "home place." An ambulance was called to take her to the hospital. Some thirty to forty-five minutes elapsed before the ambulance arrived and Mrs. Morrison remained on the floor. In the meantime, Mrs. Morrison "came out" and was able to talk. When the ambulance arrived she was placed on a stretcher. At that point, Mrs. Morrison said: "Wait a minute; I have got some business I want to tend to." She asked Mrs. Tuckwiller to "get that piece of paper * * * that we have our agreement on." She wanted it witnessed. She handed the paper to one of the ambulance attendants, told him what it was and asked him to sign it. A second ambulance attendant also signed the paper. Mrs. Morrison, according to John Tuckwiller, then asked Mrs. Tuckwiller to put the date on it "so it will come after my will" and the date May 6, 1963 was written on it. One of the ambulance attendants, called as a witness for plaintiff, testified that Mrs. Morrison said that "she had some business she wanted to get taken care of first." He recalled further conversation, although he did not recall what was said. The other attendant who testified for defendants did not recall hearing Mrs. Morrison say anything. He said that he signed the paper at Mrs. Tuckwiller's request.

Mrs. Morrison was again taken to the hospital at Marshall. Her attending physician found some mental confusion at that time. However, she improved and was discharged on May 11, again with a diagnosis of cardio vascular accident. The hospitalization prevented Mrs. Morrison from keeping her appointment for May 7 with her attorney. She returned to the home place and had been there only two hours when she again fainted and fell. She was put to bed and when her condition continued to worsen, she was readmitted to the hospital on May 15, where she remained until her death on June 14 from a cerebral vascular accident. During her final illness, Mrs.

Morrison was attended by two special nurses. Mrs. Tuckwiller also spent much time at the hospital, assisting as she could. Mrs. Tuckwiller's daughters also assisted in Mrs. Morrison's care and one made a claim against the estate for her services. None of the hospital expenses were paid by Mrs. Tuckwiller.

At the trial, plaintiff offered evidence that the life expectancy of a 73-year old person ranged from 8.69 to 9.35 years. The defendants' evidence was limited to the hospital records of Mrs. Morrison's three hospitalizations, the testimony above referred to of one of the ambulance attendants, and testimony of a nursing home operator that the cost for care and service there was $200 per month.

The trial court, while recognizing that some money value might be placed upon the services rendered during the six weeks' period, concluded that at the time the "Contract was made the type, kind and duration of the services required, were so uncertain that they could not be measured by a money standard." The court concluded that the contract was not inequitable when it was made, that plaintiff had performed her obligations under the contract and that it would not be inequitable to decree specific performance.

On this appeal, the defendants' sole contention is that specific performance should not be decreed because "the meager services rendered decedent by plaintiff are easily ascertainable and plaintiff can be compensated by the payment of money, and specific performance of the alleged contract * * * results in unjust enrichment to plaintiff, is inequitable and unconscionable, and is based on inadequate consideration, and is grossly unjust to defendant Davidson College."

This case is one of the infrequent exceptions in cases involving an alleged contract to devise property in return for services in that the contract involved is in

writing. By far the majority of such cases involve oral contracts, thereby presenting questions of the effect of the statute of frauds. In the often cited case of Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, Judge Graves discussed the "exception which courts of equity have ingrafted upon the statute of frauds" in the enforcement of such contracts. As Judge Graves pointed out, the statute of frauds was designed to avoid "the dangers which developed in permitting the title to real estate and contracts as to other weighty matters to rest in parol." However, when the statute came to be used as an instrument for perpetrating fraud, equity established exceptions to the statute's requirements, to be applied under "well-defined rules of procedure—rules, which like the statute itself, would be a safeguard as against the perpetration of frauds." The rules laid down in Walker v. Bohannan, supra, were reiterated and applied as recently as 1965 by this court in Watkins v. Watkins, Mo.Sup., 397 S.W.2d 603, 609 [2, 3].

Following such rules, this court, in Selle v. Selle, 337 Mo. 1234, 88 S.W.2d 877, refused specific performance of an oral contract to devise an 80-acre tract valued at $2000 in return for care of the promisor for the rest of his life, where the promisor, then 71 years old, survived the alleged agreement by only twelve days, and the value of the services rendered him did not exceed $150.00. Although it accepted with some reluctance the trial court's finding that the contract had been proved, the court pointed to "the short duration of the service rendered by plaintiff" and left him with only a right to recover the readily acertainable reasonable value of such services.

Relying primarily upon Selle, defendants strongly contend that the trial court should not have ordered specific performance and the transfer of a farm valued at $34,400, in return for seven days' services, which, according to defendants, could easily be valued. (Defendants suggest a value of $133 for the services.)

However, the contract here is in writing. Therefore, the question is not whether equity should apply its established rules for determination of whether the bar of the statute of frauds may be avoided. The question is simply whether according to established principles equity should withhold the relief of specific performance.

In several respects the rules which were expressed in Walker v. Bohannan, supra, are similar to those generally applied in determining whether or not specific performance lies. Equity will not decree specific performance of an inequitable contract or an unconscionable bargain, oral or written. 49 Am.Jur., Specific Performance, § 6, p. 10. A "shockingly inadequate" consideration (Miller v. Coffeen, 365 Mo. 204, 280 S.W.2d 100, 103) may produce such unfairness as will cause specific performance to be withheld, whether the contract be oral or written. An adequate legal remedy, the essential basis of the contention that plaintiff should be merely compensated for the services which she rendered, is a generally accepted bar to equitable relief. Id., § 10, p. 18.

Here significant, however, is that in determining whether or not a contract is so unfair or inequitable or is unconscionable so as to deny its specific performance, the transaction must be viewed prospectively, not retrospectively. The same rule applies with respect to sufficiency of consideration. Berg v. Moreau, 199 Mo. 416, 97 S.W. 901, 9 L.R.A.,N.S., 157; Powers v. Mercantile-Commerce Bank & Trust Co., Mo.Sup., 217 S.W.2d 375, 378 [3]; Roberts v. Clevenger, Mo.Sup., 225 S.W. 2d 728, 733 [9, 10]. See Walker v. Bales, Tenn.App., 197 S.W.2d 401, 405; Tunks v. Vincent, 241 Ky. 379, 44 S.W. 2d 282, 285; Velikanje v. Dickman, 98 Wash. 584, 168 P. 465, 470; Tate v. Murphy, 202 Okl. 671, 217 P.2d 177, 187, [10], 18 A.L.R.2d 842; Shaw v. Miller, 215 Ga. 413, 110 S.E.2d 759; Dingler v. Ritzius, 42 Idaho 614, 247 P. 10, 49 A.L.R. 598; Howe v. Watson, 179 Mass. 30, 60 N.E.

415; Annotation "Change of conditions after execution of contract or option for sale of real property as affecting right to specific performance," 11 A.L.R.2d 390, § 18, "Death; contracts to devise," p. 442; Pomeroy's Specific Performance of Contracts (3d ed.), § 195, p. 507; 5A Corbin on Contracts, § 1162, p. 216.

Viewed in this light, we find that plaintiff gave up her employment with which she was well satisfied and undertook what was at the time of the contract an obligation of unknown and uncertain duration, involving duties which, in the usual course of the disease from which Mrs. Morrison suffered, would have become increasingly onerous. By all of the evidence Mrs. Morrison's outlook was optimistic at the time of the agreement, although she had a clear appreciation of her future. Mrs. Morrison had a normal life expectancy of several years. There is nothing to indicate that plaintiff anticipated the early death of Mrs. Morrison and that she accepted the contract with the knowledge that her obligation would be of brief duration. Defendants point out that, at the time of Mrs. Morrison's first hospitalization, plaintiff's husband called Mrs. Morrison's sister in Virginia and advised her that Mrs. Morrison was very ill. However, at the time of the contract, Mrs. Morrison had apparently recovered from the illness which had required her hospitalization.

■ Viewed from the standpoint of Mrs. Morrison, the contract cannot be considered unfair. She was appreciative of the care and attention which plaintiff had given her prior to the agreement. Although, as defendants suggest, such prior services cannot provide the consideration essential to a binding contract, such prior services and the past relation of the parties may properly be considered in connection with the fairness of the contract and adequacy of the consideration. 5A Corbin on Contracts, § 1165, p. 227. Aware of her future outlook and having no immediate family to care for her, Mrs. Morrison was understandably appreciative of the personal care and attention of plaintiff and concerned with the possibility of routine impersonal care over a long period of time in a nursing home or similar institution. Having no immediate family which might be the object of her bounty, she undoubtedly felt more free to agree to dispose of the farm without insisting upon an exact quid pro quo. Her insistence that the contract be witnessed prior to her hospitalization is clear evidence of her satisfaction with the bargain as was her unsuccessful effort to change her will to carry out her agreement.

Defendants hint that the contract was unfair because of evidence of mental confusion of Mrs. Morrison at her hospitalization in April and again on May 6. However, there is no evidence that Mrs. Morrison was other than mentally alert between her discharge from the first hospitalization and the second hospitalization, the period during which the contract was finally agreed to. In fact, all of the evidence was that during such period she was mentally alert and fully aware of what she was doing. We reject any suggestion that the contract was unfair because plaintiff took advantage of Mrs. Morrison's weakness.

■ Properly viewed from the standpoint of the parties at the time of the agreement, we find that the contract was fair, not unconscionable, and supported by an adequate consideration. Although not conceding that such conclusion is correct, defendants argue, in effect, that in view of the obviously brief duration of plaintiff's services and their value in comparison with the value of the farm, plaintiff should be obliged to accept the offered payment of the reasonable value of her services and denied the relief of specific performance. Defendants point out that the trial court found that valuing the services which plaintiff rendered might be "possible." That conclusion is undoubtedly correct and unquestionably the monetary value of plaintiff's services would have been a quite small proportion (perhaps one percent) of the value of the farm. Once, however, the essential fairness of the contract and the ade-

quacy of the consideration are found, the fact that the subject of the contract is real estate answers any question of adequacy of the legal remedy of monetary damages. "Whenever a contract concerning real property is in its nature and incidents entirely unobjectionable—that is, when it possesses none of those features which * * * appeal to the discretion of the court—it is as much a matter of course for a court of equity to decree a specific performance of it, as it is for a court of law to give damages for the breach of it." Pomeroy's Specific Performance of Contracts (3d ed.), § 10, p. 23.

We deem it unnecessary here to distinguish at length the many cases cited by defendants in which the court refused specific performance of an oral agreement to devise real estate and left the promisee to a claim for the monetary value of the services rendered. Basically, the fact that all involved alleged oral contracts is a sufficient ground of distinction from the case here.

Selle v. Selle, supra, Hardy v. Dillon, Mo.Sup., 207 S.W.2d 276, Feigenspan v. Pence, 350 Mo. 821, 168 S.W.2d 1074, Schebaum v. Mersman, Mo.Sup., 191 S.W.2d 671, cited by defendants, all involved oral contracts. In only Selle v. Selle, supra, did the brevity of the services appear to be a decisive factor. Defendants also cite cases in which all relief was denied because of failure to prove the alleged oral contract. Among those are Rosenwald v. Middlebrook, 188 Mo. 58, 86 S.W. 200, Perrin v. Grimshaw, Mo.Sup., 221 S.W.2d 727. In Herman v. Madden, 349 Mo. 447, 162 S.W. 2d 268, the promisee failed to prove performance of the oral contract which he alleged. Jesse v. O'Neal, 364 Mo. 333, 261 S.W.2d 88, involved an attempt to enforce the contract to devise during the promisor's lifetime.

Defendants point out that, in Buxton v. Huff, Mo.Sup., 254 S.W. 79, 80, the court stated:

"The payment of a consideration in money, of itself, 'will not in general be

deemed such a part performance as to relieve a parol contract from the operation of the statute,' because the repayment of the money will ordinarily place the parties in their previous position. Rhodes v. Rhodes, 3 Sandf. Ch. (N.Y.) 279. This is the general rule applied in cases like this, and applied even where services are rendered but are of a sort that their worth can be justly estimated and recompensed in money (Grindling v. Rehyl, 149 Mich. 641, 113 N.W. 290, 15 L.R.A. [N.S.] 466; 25 R.C.L. pp. 307, 308), and this accords with the rule as applied to contracts in writing. Even these last are not specifically enforced when a breach can be compensated in damages. The fact that the contract is not in writing does not, of course, eliminate this principle."

What was said in that case about written contracts was wholly dictum, the case being one involving an oral agreement. In fact, the case did not even involve the rendition of services as partial performance of an oral contract. The partial performance relied upon was the payment of money.

■ As we pointed out above, oral and written contracts to devise real estate present different problems when specific performance is sought. Equity will ignore the requirements of the statute of frauds, as it must do in specifically enforcing oral contracts, only in order to avoid a fraud upon the performing party. An award of monetary payment may often be adequate to avoid such a result and will, therefore, often be the relief granted when the contract is oral. When the statute of frauds is not involved, specific performance of a contract to convey or to devise realty is the rule, not the exception. 49 Am.Jur., Specific Performance, § 92, p. 107. See State ex rel. Place v. Bland, 353 Mo. 639, 183 S. W.2d 878, 889–890 [21–24]; Rice v. Griffith, 349 Mo. 373, 161 S.W.2d 220, 225 [4–7]; 5A Corbin on Contracts, § 1162, p. 217.

Admittedly, as defendants point out, no previously decided case by this court has ordered specific performance of a contract

to devise real estate, in writing or oral, where the duration of the services for which the devise was promised was as brief as those in this case. Berg v. Moreau, supra, involving an oral contract under which services were performed for about a year apparently involved the least period of services in return for which specific performance was ordered. However, that fact is not here decisive. This case must stand on its own merits and, in our opinion, it was properly one in which specific performance was ordered.

The decree is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.