John P. TRYON and Darvene Tryon, Appellants,

v.

Charles McELYEA, John L. Walker, and Phillips, McElyea, Walker & Carpenter, P.C., Respondents.

No. 19624.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 27, 1995.

Motion for Rehearing and Transfer to Supreme Court Denied Nov. 20, 1995.

John Harl Campbell and Andrew H. McCue, Campbell, Holt & McCue, Kansas City, for appellants.

Harold F. Glass, Schroff, Glass & Newberry, P.C., Springfield, for respondents.

CROW, Judge.

Plaintiffs, John P. Tryon ("Phil"[1]) and Darvene Tryon, sued Defendants, Charles McElyea, John L. Walker, and Phillips, McElyea, Walker & Carpenter, P.C., for malpractice. The first two defendants are lawyers and shareholders in the third defendant, a professional corporation.

A jury returned a verdict for Defendants. The trial court entered judgment thereon. Plaintiffs appeal.

Plaintiffs' brief presents three points relied on; however, at oral argument Plaintiffs abandoned their first point. Their two remaining points assign error in evidentiary rulings by the trial court. We preface our discussion of those issues with a synopsis of the evidence.

In 1985, Plaintiffs (husband and wife) and Marie Scott (Darvene's mother) owned Malibu Beach Resort in Camden County. Plaintiffs had operated it some twenty years.

On a date unrevealed by the record, but inferably around May 1, 1985, some people came to the resort and told Plaintiffs they were interested in buying it. Phil testified the group consisted of Leslie Blair, Alan Blair, William Johnson, John Galdamez and Frank Christenson. Darvene recalled the group consisted of the Blairs, Christenson, and perhaps Johnson and Galdamez. At either that meeting or a later one, Plaintiffs told the prospective buyers the price was $1,250,000.

By June 3, 1985, discussions had progressed far enough that Plaintiffs went to Defendant McElyea. Darvene testified: "[W]e told him that we had these people that wanted to buy the resort and we didn't know how to go about it. We wanted him to take care of everything for us."

For the next several weeks, negotiations proceeded between Plaintiffs, represented by McElyea, and the prospective buyers, represented by lawyer John Curran. When Mc-

Elyea was unavailable, Walker represented Plaintiffs.

A contract of sale was signed July 31, 1985, naming Plaintiffs and Marie Scott as sellers and Glaize Cay Development Corp. ("Glaize Cay") as buyer. Glaize Cay had been incorporated by the prospective buyers while the negotiations advanced. The contract was signed for Glaize Cay by Alan Blair, its president, and Galdamez, its secretary.

The contract specified a purchase price of $1,250,000 to be paid:

a. $100,000 upon signing the contract, deposited with Bank of Lake of the Ozarks as agent for the sellers.

b. $316,666 at closing.

c. $833,334 to be paid per a promissory note secured by a deed of trust on the resort. The note called for five annual payments of principal in the amount of $100,000 each, beginning August 15, 1986. On August 15, 1991, all remaining principal was due. Interest was to be paid monthly starting September 15, 1985, and continuing until August 15, 1986. Beginning that date, interest was to be paid quarterly until August 15, 1991, when all remaining indebtedness was to be paid.

One provision in the contract required Plaintiffs to release segments of the resort from the lien of the deed of trust as the indebtedness was reduced.

The sale was closed August 21, 1985. Plaintiffs received the $416,666 cash pursuant to provisions "a" and "b" of the contract, *supra.* They also received the promissory note secured by the deed of trust.[2] Pursuant to the proviso described in the preceding paragraph, Plaintiffs simultaneously released one segment of the resort from the lien of the deed of trust.

Shortly after the closing, Glaize Cay was renamed "The Moorings at Malibu, Inc." ("Moorings"). According to Darvene, Moor-

---

1. At trial, Plaintiff John P. Tryon was referred to as "Phil." For convenience and clarity, we shall refer to him that way and we shall refer to Plaintiff Darvene Tryon by her forename. We mean no disrespect. We shall refer to Phil and Darvene collectively as "Plaintiffs."

2. Marie Scott was not a payee on the note, a circumstance that is unexplained.

ings made the first nine monthly interest payments on time, then "they started just getting a little later and a little later." Moorings was nonetheless able to make the first $100,000 principal payment in August, 1986.

Darvene testified that the quarterly interest payment due February 15, 1987, "was like 18 or $21,000, somewhere in that vicinity." Darvene recounted that several of the investors in Moorings came to Plaintiffs' home and said they were unable to make the payment. Roderick Russell, a member of the group, paid Plaintiffs $10,000 a few days later. That was the last sum Plaintiffs ever received on the note.

Plaintiffs eventually consulted lawyer Warren Donaldson about collecting the unpaid balance on the note. He asked Plaintiffs whether "there were any personal guaranties."

Both Phil and Darvene testified they did not know at that time what a personal guaranty was.

In December, 1987, Donaldson began publication of notice of foreclosure of the deed of trust. In January, 1988, prior to the date designated for the sale, Moorings filed a petition in bankruptcy.

While the bankruptcy was pending, Donaldson assisted Plaintiffs in negotiating an "Agreement for Deed in Lieu of Foreclosure." Pursuant thereto, Moorings gave Plaintiffs a quitclaim deed May 26, 1989. As we understand it, the deed conveyed to Plaintiffs all of the resort property originally covered by the deed of trust except the segment Plaintiffs released at closing, August 21, 1985.

Plaintiffs ultimately sold the property to "Bax Construction" for $520,000 on January 25, 1991. Some of that amount was in cash, the rest was in two parcels of real estate.

Plaintiffs filed this suit April 8, 1991. Their theory of liability against Defendants, as submitted in the verdict-directing instruction tendered by Plaintiffs and given by the trial court, was that Defendants were negligent in failing to advise Plaintiffs of the need to obtain personal guaranties from the principals of Glaize Cay.[3] Darvene testified that because of Defendants' negligence, Plaintiffs sustained over a half million dollars in damage.

On the fact question of whether McElyea or Walker ever mentioned personal guaranties, Phil testified:

"Q  At any time during the course of the conversations with either Mr. Walker or Mr. McElyea did you discuss with them what personal guaranties were?

A  No.

Q  Did you at that time know what a personal guaranty was?

A  No."

Darvene testified:

"Q  Mrs. Tryon, during the course of any of these meetings or at any time before the real estate contract was signed, did anyone from Mr. McElyea's office discuss with you the subject of personal guaranties?

A  No, sir.

Q  Did anyone say to you what a personal guaranty was?

A  No.

Q  Was there any discussions about personal guaranties at any meetings?

A  No, there wasn't.

Q  Did you know what a personal guaranty was?

A  At that time?

Q  Yes.

A  No."

3. The verdict-directing instruction read:
    "Your verdict must be for plaintiffs Phil and Darvene Tryon against defendants ... if you believe:
    First, defendants failed to advise plaintiffs of the need to obtain personal guarantees from the principals of Glaize Cay Development Corp. protecting plaintiffs against default by Glaize Cay Development Corp., and
    Second, defendants were thereby negligent, and
    Third, as a direct result of such negligence, plaintiffs sustained damage."

Plaintiffs presented expert testimony that in the circumstances surrounding the sale by Plaintiffs to Glaize Cay, failure of Plaintiffs' lawyers to advise Plaintiffs about personal guaranties by the principals of Glaize Cay was a failure to use the degree of skill and learning ordinarily used under the same or similar circumstance by members of Defendants' profession. Plaintiffs adduced testimony from some of the principals of Glaize Cay that their net worth exceeded the amount of Plaintiffs' damages.

McElyea testified he advised Plaintiffs that one way to secure the note would be personal guaranties, and that without them the only way to collect if Glaize Cay failed to pay would be to foreclose on the resort, then sue Glaize Cay for any deficiency. McElyea quoted Plaintiffs as saying they "were not interested in personal guaranties."

Walker testified he conferred with Plaintiffs June 14, 1985, and immediately thereafter he and they attended a conference with Curran and some of the buyers, including Johnson, Christenson and perhaps Alan Blair. Walker recounted he discussed personal guaranties with Plaintiffs, advising them that without such guaranties Plaintiffs could sue no one except Glaize Cay if the note was not paid and the resort was insufficient security to satisfy the debt. Walker avowed Plaintiffs told him they had discussed personal guaranties with McElyea and were aware no such guaranties would be given, but they nonetheless wanted to go through with the transaction.

Alan Blair testified no one told him that McElyea asked for personal guaranties on the note to Plaintiffs. Blair added that he would not have signed one had he been asked.

Curran testified that Walker and McElyea brought up the subject of personal guaranties during the negotiations. According to Curran, inasmuch as his clients were making a "considerable" down payment, they "laughed when it was brought up." Curran quoted his clients as saying, "We'll walk if you're going to insist on it." Curran avowed he informed McElyea and Walker about the buyers' response.

Christenson testified that during a meeting at Curran's office, either McElyea or Walker asked whether the principals of Glaize Cay were going to give personal guaranties. Christenson recounted they said no and "were very emphatic." According to Christenson, it would have been a "deal breaker" for him.

Galdamez testified the subject of personal guaranties came up in a conference attended by him, Curran, Christenson, Johnson and perhaps Alan Blair. Galdamez explained: "I ... remember everybody having a hardy laugh that, you know, my goodness, it was not just no but it was heck no.... It was dead on arrival."

■ With that background, we address Plaintiffs' second point. It avers the trial court erred by receiving Defendants' Exhibit 20 in evidence.

The issue arose during cross-examination of Phil by Defendants' lawyer, who asked Phil whether he understood he was "getting a hundred thousand dollars down" when he first started talking to the principals of Glaize Cay. Phil answered, "Yes." Phil acknowledged receiving the $100,000, and stated he received it after he and Darvene contacted McElyea. Phil explained, "We had a meeting with ... Mr. McElyea at his office before we got the check."

Immediately following that answer, Plaintiffs' lawyer requested, and received, a bench conference. Plaintiffs' lawyer addressed the trial court:

"[Defendants' lawyer] has now handed me what he has had marked as Defendant's [sic] Exhibit 20 which is the real estate contract. We object to its use to the extent that Defendant [sic] proposes to use it as evidence of a contract. It's a violation of the parole [sic] evidence, its [sic] a violation of statute and it is not relevant to prove anything. And we object to its use with this witness or at all."

Exhibit 20 is a printed form designated "Contract for the Sale of Real Estate." It bears a handwritten date of June 1, 1985, names the sellers as "Phil and Darveen [sic] Tryon," and names the buyer as "Pelican

Bay Development Corp. Inc."[4] Exhibit 20 identifies the property to be sold as "Malibu Beach Resort," states the price is $1,250,000, and provides for payment of $100,000 "at the time of the execution and delivery of this contract, the receipt of which is hereby acknowledged by the Seller...." No seller's signature appears at the foot of Exhibit 20.

Defendants' lawyer told the trial court: "I do not intend to use this exhibit ... to take the position ... that a contract was made as of the date of this instruction [sic]. I do intend to use the instrument to prove through this witness, rehabitate [sic] his memory somewhat that a hundred thousand dollar check was given to him and Mrs. Tryon either on the day June 1 of '85 or prior day and out of the evidence will be that Mr. McElyea never was contacted by Mr. Tryon and Mrs. Tryon on this sale prior to June 3, of 1985."

The trial court ruled, "That limited purpose, it'll be allowed."

Plaintiffs' lawyer registered an additional objection: "There is no foundation as to relevancy at this point."

The trial court overruled the objection and received Exhibit 20.

Defendants' lawyer then asked Phil whether he and Darvene received $100,000 on June 1, 1985. Phil answered:

"I don't know if it was from this contract.... There was a hundred thousand dollars but it was in a C.D. and put in an escrow account to Grand Glaize."

Defendants' lawyer persisted, asking Phil whether he recalled seeing "the check." Phil answered, "I just can't remember."

Later, during direct examination by Plaintiffs' lawyer, Darvene testified about the early stages of the discussions with the buyers. This dialogue ensued:

"Q When was the next occasion that you had to meet with somebody about the sale of the property?

A Well, it seems to me that they brought this paper that was an agreement to purchase. Pretty vague, not much on it.

Q Let me hand you what has been marked as Defendant's [sic] Exhibit 20, Mrs. Tryon.... Can you tell ... the jury whether or not you've ever seen Exhibit 20, the document that's titled contract for real estate?

A Yes.

Q Do you recall when you saw it?

A Well, it's dated June first, so I assume that was probably when.

Q Where were you when you saw it?

A At home. At the resort.

Q Was there anybody else there? Was it mailed to you, handed to you, how did you get it?

A No. I believe that Frank Christenson hand carried it.

.      .      .      .      .

Q Did you sign it, you and Mr. Tryon?

A No.

.      .      .      .      .

Q Was there any money exchanged at that point in time?

A No, there wasn't."

Plaintiffs' second point maintains the receipt of Exhibit 20 in evidence was erroneous in that it "neither tended to prove nor disprove any issue in dispute and was therefore logically irrelevant, and, moreover, its unarticulated probative value, if any, was greatly outweighed by the prejudicial use to which such exhibit was put by Defendants rendering it legally irrelevant."

The point yields no clue as to why Exhibit 20 was irrelevant and supplies no hint as to how it was prejudicial to Plaintiffs. From the argument following the point, we gather that prior to trial, Plaintiffs feared Defendants would try to contend, through testimony by their expert witness, that the $100,000 payment to Plaintiffs on June 1, 1985, rendered Exhibit 20 an enforceable contract for the sale of the resort, and that inasmuch as Exhibit 20 did not provide for personal guar-

4. Pelican Bay is a corporation that developed a "condominium project" prior to the events recounted in this opinion. Investors in Pelican Bay included Johnson, Christenson and Galdamez.

anties, Plaintiffs were barred from demanding personal guaranties at the time they first contacted McElyea (June 3, 1985).

Defendants made no such use of Exhibit 20 at trial. Indeed, as we have seen, Defendants' lawyer disavowed any such purpose when the admissibility of Exhibit 20 was debated at the bench.

We have carefully examined the testimony of Defendants' expert witness and have found no reference to Exhibit 20 and no testimony that Plaintiffs entered into any contract prior to the one signed July 31, 1985. Furthermore, as reported earlier, Alan Blair, Curran, Christenson and Galdamez testified the principals of Glaize Cay were unwilling to personally guarantee the note to Plaintiffs. There was no evidence by either side that any principal of Glaize Cay refused to give Plaintiffs a personal guaranty on the ground that Exhibit 20 constituted a contract of sale and barred Plaintiffs from insisting on personal guaranties.

Additionally, we have studied the final argument of Defendants' lawyer and have espied no comment about Exhibit 20. Finally, Exhibit 20 is unmentioned in the instructions, and no instruction was given hypothesizing that Plaintiffs were contractually barred from insisting on personal guaranties when they first contacted McElyea.

Thus, the role of Exhibit 20 was a narrow one, i.e., it was merely evidence that Plaintiffs received a $100,000 deposit from the buyers before Plaintiffs contacted McElyea. In that regard, later in the trial and without objection by Plaintiffs, Johnson testified he, Galdamez and Christenson went to Plaintiffs' home and left a $100,000 check written by Galdamez as a "deposit on the property." Johnson recalled this occurred "before there were attorneys involved."

Still later in the trial and without objection by Plaintiffs, Galdamez was shown Exhibit 20 and was asked whether it "accurately reflects what had transpired to the date of that document." He answered, "I would say so, yes."

He also testified that Plaintiffs received $100,000 "at the time of the first document."

■ Exhibit 20 was therefore cumulative to the testimony referred to in the two preceding paragraphs. A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection. *Eagleburger v. Emerson Electric Co.*, 794 S.W.2d 210, 239–40[26] (Mo.App.S.D.1990); *Drining v. Missouri Bone & Joint Clinic, Inc.*, 730 S.W.2d 293, 295[3] (Mo.App.E.D.1987). *See also: Dunn v. St. Louis–San Francisco Railway Co.*, 621 S.W.2d 245, 252[7] (Mo. banc 1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982); *Stanziale v. Musick*, 370 S.W.2d 261, 268[9] (Mo.1963).

Even though Exhibit 20 was cumulative, Plaintiffs argue it was prejudicial in that its failure to require personal guaranties indicates Plaintiffs were prepared to sell the resort June 1, 1985, without such guaranties. However, it can be conversely argued that the absence of any mention of personal guaranties in Exhibit 20 corroborates Plaintiffs' testimony that they did not know what personal guaranties were at the time they first consulted McElyea, June 3, 1985. If, as Plaintiffs testified, they did not know what personal guaranties were until lawyer Donaldson told them in 1987, they would not have known to insert a provision for personal guaranties in Exhibit 20 on June 1, 1985.

Consequently, even if the trial court erred in receiving Exhibit 20 in evidence—an issue we need not decide—we hold Exhibit 20 was not prejudicial to Plaintiffs.[5] As Plaintiffs point out in their brief, "Exclusive of any dispute about damages, the sole issue at trial was whether and to what extent McElyea advised the Tryons of the need to obtain personal guaranties from the principals of Glaize Cay." Nothing in Exhibit 20 harmed Plaintiffs on that issue.

---

5. Defendants did not contend that Plaintiffs received the $100,000 deposit called for in Exhibit 20 in addition to the $100,000 deposit called for in the contract signed July 31, 1985. At trial, it was undisputed that when the sale was closed August 21, 1985, Plaintiffs received one $100,000 deposit, which had been held in escrow, and an additional $316,666. The balance of the $1,250,-000 purchase price was represented by the $833,334 note.

Error without prejudice is no ground for reversal. *Neavill v. Klemp*, 427 S.W.2d 446, 448[9] (Mo.1968). Plaintiffs' second point is denied.

■ Plaintiffs' third, and final, point attacks a ruling the trial court made during the testimony of Johnson. As noted earlier, he was a principal in Glaize Cay. On direct examination by Defendants' lawyer, Johnson testified:

"Q Do you recall at the meeting in Curran's office there being a discussion of personal guarantees for the Tryon's [sic] note ...?

A I remember the issue being brought up about personal guarantees.

Q What was your position on you signing a personal guarantee to the Tryons?

A None of us at that point wanted to sign a personal guarantee on the property.

Q Why not?

A We had personal guarantees with the bank on the construction loan and we just didn't see the need to sign a person [sic] guarantee on the property."

On cross-examination, Plaintiffs' lawyer reminded Johnson about testimony he had given in a deposition some two years before trial. Confronted by that, Johnson conceded: "What I'm saying is that the issue [of personal guaranties] was brought up. I'm not saying that was personally asked of me." Cross-examination continued:

"Q I'm curious that you now remember that there were personal guarantees discussed, but when I took your deposition in 1992 and you didn't remember that. Don't you think, Mr. Johnson, that your memory was better in 1992 than it is today?

. . . . .

A I've talked to the stockholders that were involved in that, and as I said earlier, I wasn't the one that set the project up or set the deal up, I was a general contractor and investor in the project and I've talked with Frank Christenson who was the project manager since that deposition and he told me that that issue was brought up.

Q So you know that was brought up by virtue of what Mr. Christenson told you?

A That's right.

[Plaintiffs' lawyer]: I move to strike the entire line of testimony of the witness, Your Honor, on the grounds that it's clearly based on hearsay.

THE COURT: Well, that request will be denied."

Plaintiffs' third point asserts the trial court erred in denying the motion to strike "the hearsay testimony of ... Johnson regarding his purported recollection of discussions concerning personal guaranties in that Johnson admitted, on cross-examination, that his testimony was founded upon the out-of-court declarations of others."

Before the motion to strike, Johnson had testified about several subjects including the participants in the transaction, the $100,000 deposit, his role in the project, personal guaranties, setbacks that plagued the project, discussions about "giving the property back" to Plaintiffs, Moorings' bankruptcy, a problem about a road, construction and sale of buildings on the property, and depletion of construction financing. Plaintiffs' motion to strike "the entire line of testimony of the witness" did not inform the trial court that Plaintiffs wanted the court to strike only the testimony about personal guaranties.

The breadth of the motion is comparable to a motion to strike in *Gaines v. Schneider*, 323 S.W.2d 401 (Mo.App.1959), where a party moved to strike "this doctor's entire testimony ... on the grounds it is not based upon personal examination but based upon the history as furnished him by the plaintiff." *Id.* at 405. The appellate court held most of the doctor's testimony was not vulnerable to a motion to strike, hence the motion was too broad and properly denied. *Id.*

The same result was reached in *Schwinegruber v. St. Louis Public Service Co.*, 241 S.W.2d 782 (Mo.App.1951), which also involved a doctor's testimony. There, we find this:

"Counsel objected and moved to strike 'all his testimony pertaining to hypertrophic arthritis and aggravation thereof.' Much, if not all, of that evidence was properly

received. Even if some of it had been subject to objection a catchall motion of this nature would not reach the error without specification of the particular testimony regarded as inadmissible."

*Id.* at 788[10] (citation omitted).

Consistent with *Gaines* and *Schwinegruber,* we hold Plaintiffs' motion "to strike the entire line of testimony of the witness" was too broad to preserve the alleged error which Plaintiffs now endeavor to raise in their third point.

Judgment affirmed.

PREWITT, P.J., and SHRUM, C.J., concur.