In The ESTATE OF Herbert E. LOONEY, Deceased.

Mark D. SHELTON, Plaintiff–Respondent,

v.

Monica WILLIAMSON, Defendant–Appellant.

No. 21978.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 18, 1998.

510

Thomas M. Benson, Springfield, for appellant.

Richard L. Schnake, Neale & Newman, L.L.P., Springfield, Walter S. Pettit, Jr., Scott R. Pettit, Pettit & Pettit, Aurora, for respondent.

SHRUM, Presiding Judge.

Mark D. Shelton (Plaintiff) filed a claim in the probate division of the Lawrence County Circuit Court seeking "specific execution of the contract for the sale of real estate" pursuant to § 473.303–310, RSMo 1994. The claim was filed in the Estate of Herbert Looney ("Decedent").

At trial, Plaintiff produced no single written contract, but presented what the court characterized as "extensive memoranda by the deceased [that] sufficiently set forth the terms of the agreement between [Decedent] and Plaintiff, including the parties, subject matter, consideration, price and their mutual promises to satisfy [§ ] 432.010 RSMo." [1] The court granted Plaintiff's request for specific performance and ordered Monica Williamson, personal representative ("Defendant") to convey the subject real estate once Plaintiff paid the consideration yet due.[2] This appeal followed.

---

1. Commonly referred to as the "statute of frauds," § 432.010, RSMo 1994, provides, in pertinent part:

    "No action shall be brought to charge any executor or administrator ... upon any contract made for the sale of lands ... unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith...."

2. The trial court's award of specific performance in Count I rendered moot Plaintiff's second count for damages. The court also denied Defendant's counterclaim seeking return of personal property items, or alternatively, damages. Defendant has not appealed the denial of her counterclaim.

Defendant's brief presents six points relied on. First, Defendant charges the "best evidence" rule was violated when exhibits "A" and "B" (the "extensive memoranda" mentioned in the judgment) were admitted. Her second and third points assert that exhibits "A" and "B" were not sufficient to satisfy the statute of frauds requirement of a writing to memorialize the contract. Defendant's fourth point is that the trial court committed reversible error when it admitted parol evidence to prove the contract without first requiring evidence of part performance of the contract. Her fifth point claims that there was insufficient evidence to support a finding of part performance of the contract. Defendant's final point further complains about the sufficiency of the evidence. We affirm in part and reverse in part with directions.

### FACTS

Plaintiff's association with Decedent began in the early 1980s. Their relationship included Plaintiff working for Decedent and doing business together.

When Decedent died in February 1996, Austin Barrett was initially appointed personal representative of his estate. Barrett testified that soon after his appointment, Plaintiff called and said that he was "buying the property in the back of [Decedent's] property." When Barrett asked if he had "proof of that," Plaintiff answered that he did and "he [Plaintiff] brought me in the original canceled checks." Plaintiff's original checks were admitted at trial as exhibit "C." They showed monthly payments of $250 by Plaintiff to Decedent from August 1992 through July 1994 and $300 monthly payments from August 1994 through May 1996.

About the time Plaintiff produced his checks, Barrett received a "folder" of papers from Mary Morris (Decedent's mother). At trial, these documents were marked exhibit "A" and put in evidence over Defendant's objection that they violated the best evidence rule.

Barrett testified that Mary Morris had removed the exhibit "A" documents from a filing cabinet in Decedent's house soon after his death. Barrett explained: "[S]he [Mary Morris] ... went over there and felt like it needed to be up to—so nobody would take them ... because I guess she was concerned about ... the other lady that was living there."

The folder (exhibit "A") contains 36 pages. For the most part, the documents are photocopies of the monthly checks shown in exhibit "C." Also, many pages contain Decedent's handwritten notes about why the payments were being made. In part, the notations are original writings, but most are photocopies. Barrett testified: "It appears that [Decedent] had taken one of these [pages that contained handwritten notations] ... and put a check ... with a staple when he was copying it ... each time." Barrett further explained: "I think that's what [Decedent] was trying to do, is make copies of the checks so he'd have it as a receipt for himself that he was paid."

As to the whereabouts of the original exhibit "A" documents, Barrett testified:

"Q. Did you ask her [Mary Morris] where the originals were on these?

"A. No. I didn't ask her that.... That's all she said she had, and that's all she said was there.

. . . .

"Q. And you didn't ask her where the originals were or why these had copies on them?

"A. Well, because I didn't know at the time until [Plaintiff] got ahold of me and said he had the original checks. Since they were copies of checks, I assumed that [Decedent] was making copies of checks, that he [Plaintiff] had the original checks since it was his checking account, and that the copies—you know, [Decedent] was making a copy for himself."

At trial, Plaintiff identified exhibit "B" as "receipts ... [Decedent] gave me [on] the purchase of 80 acres of land." Plaintiff described exhibit "B" as a record of his "transaction" with Decedent concerning the subject real estate. He explained the creation of this record as follows.

Plaintiff personally delivered each payment to Decedent, whereon Decedent would

give Plaintiff a receipt. Each receipt, however, was for the previous month's payment and consisted of a photocopy of the prior month's check with Decedent's handwritten notations or other materials describing their transaction. Generally, the handwritten notations and other materials (such as real estate tax receipts containing legal descriptions) were also photocopies. Plaintiff testified that it appeared to him that Decedent had established a "matrix" to serve as a receipt and as monthly confirmation of their agreement. Continuing, Plaintiff testified that apparently each time Plaintiff paid Decedent, he (Decedent) put that month's check on the matrix and then made two copies, one for himself and one for Plaintiff. Consequently, exhibits "A" and "B" are identical in many respects.

The documents in exhibits "A" and "B" contained various handwritten explanations by Decedent concerning the photocopied checks. For example, on one of the forms repeatedly used by Decedent, he wrote:

"Started Aug 1–1992 on land below

. . . .

"land in Rear

"357.00   Per A AT 6% INT."

At the bottom of this particular form, Decedent photocopied two tax receipts containing land descriptions. One receipt describes "59.50 ACRES—S 1/2 SW NE (Ex W 2 rds) & N pt NW SE (Ex W 2 rds) & 6 acres W side NE SE ... Sec ... 31 Twp ... 27 Range ... 28." The other describes "19.73 ACRES—E 1/2 NE NW ... Sec ... 31 Twp.... 27 Range ... 28." Decedent's original signature appears on at least two of these forms.

On another form used by Decedent, he wrote the following above each photocopied check: "Started Aug 1–1992 on 80 acres more or less on the Rear of 140 acres."

After Austin Barrett verified Plaintiff's cancelled checks against the receipts prepared by Decedent, he calculated the balance due on the land. Barrett intended to consummate the sale. However, he resigned as personal representative without closing the land sale with Plaintiff. Defendant was ap-

pointed as successor personal representative and this suit followed.

The trial court found that the documents in evidence were sufficient to satisfy all requirements of the statute of frauds and ordered all parties to specifically perform the contract. Defendant appeals from that judgment.

## STANDARD OF REVIEW

■■■ As in most court-tried civil cases, our review of a specific performance case "is governed by Rule 73.01(c), as construed in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976)." *Kackley v. Burtrum*, 947 S.W.2d 461, 463 (Mo.App.1997). The trial court's judgment will be affirmed unless the court erroneously declares or applies the law, there is no substantial evidence to support the judgment, or it is against the weight of the evidence. *Id.* at 463[1]. On appellate review "[i]nferences most favorable to the prevailing party will be drawn." *Bayless Building Materials Co. v. Peerless Land Co.*, 509 S.W.2d 206, 208 (Mo.App.1974).

## DISCUSSION AND DECISION

*Point I: Alleged Violations of Best Evidence Rule*

Defendant's first point charges that the court abused its discretion in admitting exhibits "A" and "B" because the documents in those exhibits were mostly photocopies; consequently, they violated the best evidence rule.

■■■ Generally, the terms of a document must be shown by producing the original of the document. *Interstate Distrib., Inc. v. Freeman*, 904 S.W.2d 481, 484[7] (Mo.App. 1995). "A copy reproduced by a photographic duplicating process is not admissible under the best evidence rule." *Id.* at 484[8].

■■■ Exceptions to this rule exist, however, and "[s]econdary evidence ... may be admitted if the offering party demonstrates that the primary evidence is lost or destroyed, is outside the jurisdiction, is in the possession or control of an adversary, or is otherwise unavailable or inaccessible." *Id.* at 484[9]. Moreover, when complaints concerning the " 'best evidence rule' " are urged, a

trial court's broad discretion is subject to reversal only in cases of clear abuse." *Lewis v. Bucyrus–Erie, Inc.*, 622 S.W.2d 920, 925[5] (Mo.banc 1981).

Here, Defendant argues that the trial court abused its discretion in admitting exhibits "A" and "B" because no evidence exists to support a finding of any exception to the best evidence rule. Defendant avers that reversal is mandated because the trial court relied heavily on these exhibits in deciding that Plaintiff and Decedent had sufficiently memorialized their contract to take it out of the statute of frauds.

■ In response, Plaintiff argues, *inter alia*, that Defendant waived the best evidence objection to the admission of exhibit "B" at trial and cannot make that claim on appeal. We agree.

■ A party must object at the earliest possible opportunity to opposed evidence to avoid waiver of the objection. *Gage v. Morse*, 933 S.W.2d 410, 418[9] (Mo.App.1996). "The only objections to evidence that can be considered on appeal are those that were properly raised in the trial court." *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 650[16] (Mo.banc 1997); Rule 84.13(a).[3] That includes objections to documents "for the reasons they were photocopies." *In re Estate of Danforth*, 705 S.W.2d 609, 613 (Mo.App. 1986).

Here, Plaintiff identified exhibit "B" as a "group of papers" and "receipts that [Decedent] gave me" relating to Plaintiff's "purchase of 80 acres of land." After further identification, Plaintiff's lawyer moved the admission of exhibit "B" into evidence. At that point, an on-record colloquy occurred between Defendant's lawyer and Plaintiff's lawyer about how exhibit "A" compared with exhibit "B." During this discussion Defendant's lawyer voiced no objection to the admission of exhibit "B." A recess was taken, following which Defendant's lawyer announced: "Judge, I have no other objections other than the continuing objection that I have." Without further comment, the trial court admitted exhibit "B" in evidence.

Careful examination of the record shows that the only "continuing objection" voiced by Defendant was wholly unrelated to the "best evidence rule." The "continuing objection" came early in the case, when Plaintiff started to testify about his contract to buy land from Decedent and Defendant's lawyer objected, invoking the statute of frauds. No objection based on the best evidence rule was voiced as part of any continuing objection. If defense counsel thought he had a continuing "best evidence" objection to exhibit "B," it must have stemmed either from some pre-trial ruling or to another discussion off the record to which we are not privy. Defendant's failure to make the best evidence objection to exhibit "B" is fatal to the preservation of the error asserted in this point.

■ In reaching this conclusion, we do not ignore the fact that Defendant interposed a timely "best evidence" objection to exhibit "A" earlier in the case and that the trial court overruled the objection. We are also mindful of the principle that when a party has duly objected to a certain type of evidence and the objection has been overruled, it is not necessary to repeat the objection to further evidence of the same type. *Gage*, 933 S.W.2d at 417[8] (citing *State ex rel. Highway Comm'n v. Offutt*, 488 S.W.2d 656, 661[5] (Mo.1972)). However, this latter rule has no applicability here. Exhibit "A" contained documents identified as Decedent's records, whereas exhibit "B" was Plaintiff's records "on his transaction." They are not the "same type" evidence in the sense that an adverse ruling on exhibit "A" made it "futile, and therefore unnecessary" to object to exhibit "B." *See, e.g. Critcher v. Rudy Fick, Inc.*, 315 S.W.2d 421, 429[10] (Mo.1958). Consequently, the rule stated in *Gage* is inapplicable here.

Because Defendant's assertion of error concerning exhibit "B" was not preserved by timely objection, we deny her Point I argument as it relates to exhibit "B."

■ As to the evidence in exhibit "A," in all essential respects it is cumulative to the evidence in exhibit "B." "A party cannot be prejudiced by the admission of allegedly in-

---

3. References to rules are to Missouri Rules of Civil Procedure (1998).

admissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *Tryon v. McElyea,* 912 S.W.2d 73, 78[2] (Mo.App.1995). We find, therefore, that the departure, if any, from the best evidence rule in admitting exhibit "A," is harmless. *Lewis,* 622 S.W.2d at 925. We deny Point I.

*Points II & III: Did Exhibits "A" & "B" Satisfy Statute of Frauds*

Defendant's second point maintains that the trial court erred in finding that the exhibits sufficiently set forth the terms of Plaintiff's and Decedent's contract to take it out of the statute of frauds "because the subject matter, consideration, price and mutual promises were not proven by clear and convincing evidence." In a related argument, Defendant's third point asserts that the trial court's conclusion that the exhibits satisfied the statute of frauds was against the weight of the evidence or, alternatively, that the trial court misapplied the law as "there was no showing that the separate documents relied on were connected by express reference to one another or by clear implication, as required by law." We disagree with each of these arguments.

■ Preliminarily, we note that clear and convincing evidence is required when a party seeks specific performance of an *oral* contract to sell land between a living party and a deceased party. *See, e.g. Ver Standig v. St. Louis Union Trust Co.,* 344 Mo. 880, 129 S.W.2d 905, 907 (1939); *Hackbarth v. Gibstine,* 182 Mo.App. 113, 118 (Mo.App.1944). However, this is not an oral land contract case. The trial court found that sufficient written memoranda existed to satisfy the statute of frauds. Consequently, case law and principles that are exclusively applicable to oral contracts are inapposite here. When the statute of frauds is not implicated, i.e., when a writing is sufficient, the quantum of proof is less than the "clear, cogent and convincing" standard. *See State ex rel. Place v. Bland,* 353 Mo. 639, 183 S.W.2d 878, 888[16] (Mo.1944).

■ A writing satisfies the statute of frauds "memorandum" requirement if it sets forth the essential terms of a contact. *Sea-*

baugh v. Sailer, 679 S.W.2d 924, 926[2] (Mo. App.1984). The "essential terms" of a contract for the sale of real estate are: the parties, the subject matter, the consideration, the price, and promises upon both sides. *Id.* When these essential provisions exist in a document, it is specifically performable even though it may leave something to be desired in draftsmanship or could have been more clearly stated. *Wilkinson v. Vaughn,* 419 S.W.2d 1, 7[11] (Mo.1967). A writing need not be an explicit and complete contract, and the terms therein need not be definite, as long as the substance of the agreement appears from the writing. *Bayless Building,* 509 S.W.2d at 211; *Barnett v. Western Union Tel. Co.,* 287 S.W. 1064, 1067 (Mo.App. 1926). The terms may be "made certain ... when the circumstances are shown" by extrinsic evidence. *Id.* at 1067[3]. *See also Seabaugh,* 679 S.W.2d at 926[4].

■ To satisfy the statute of frauds, it is not essential that a writing be a single document. *Bayless,* 509 S.W.2d at 211[1]. Instead, the agreement may "be contained in separate writings when the separate writings, taken together, meet the requirements of the statute." *Logan v. Waddle,* 315 Mo. 980, 287 S.W. 624, 625 (1926). Contract "elements missing or uncertain in one [writing] may be supplied or rendered certain by another, and their sufficiency will depend upon whether, taken together, they meet the requirements of the statute as to content." *Wheeler v. Blanton,* 253 S.W.2d 497, 499[1] (Mo.App.1952). The documents need only be connected either by express reference to one another or by clear implication established through their respective contents. *Sales Service, Inc. v. Daewoo Int'l (America) Corp.,* 770 S.W.2d 453, 456 (Mo.App.1989); *Mayer v. King Cola Mid–America, Inc.,* 660 S.W.2d 746, 748[4] (Mo.App.1983).

■ Defendant first argues that the subject matter of the contract (the land allegedly sold) is not clearly identified. This court disagrees. Many of the pages in exhibits "A" and "B" that contain a photocopied check, also have a handwritten notation that the payment is "on land below." The trial court could reasonably have inferred that the

phrase "land below" referred to the real estate described in tax receipts copied at the bottom of the page. Other documents in exhibits "A" and "B" contain this notation: "Started Aug 1–1992 on 80 acres more or less on the rear of 140 acres."

Taken together and in context, exhibits "A" and "B" make it clear that the subject of the contract is 80 acres on the rear of Decedent's farm, the legal description of which was readily ascertainable from the referenced tax receipts. Moreover, case law clearly establishes that the statute of frauds does not compel rejection of a contract because of imperfections or deficiencies in the land description *if* the "location in any manner otherwise appears from the writing, or, if the property can be identified with reasonable certainty with the aid of the data supplied by the instruments and a consideration of the attending circumstances." *Ray v. Wooster,* 270 S.W.2d 743, 750 (Mo.1954). *See Seabaugh,* 679 S.W.2d at 926 (holding that receipt of $1,000 "downpayment on farm" of 185 acres was adequate legal description to satisfy statute of frauds where the only real estate owned by deceased was a 185–acre farm). We find that the land descriptions in the tax receipts, viewed in light of all the evidence, were sufficient to satisfy the statute of frauds.[4]

■ Next, Defendant charges that the documents do not show the parties' promises, and, consequently, the documents lack an essential element of a contract. First, Defendant complains that the documents contain no explicit promise by Plaintiff to pay a certain sum of money under the contract or to pay a certain sum per month over a specific period of time. Yet, as explained before, exhibits "A" and "B" provide sufficient evidence to support a finding that Plaintiff's payments "started Aug 1–1992 on 80 acres" at a price of $357 per acre. Thus, the exact amount Plaintiff promised to pay was ascertainable "simply by computation," and that satisfies the statute of frauds. *See Tracy v. Aldrich,* 236 S.W. 347, 350[3] (Mo.1921).[5]

■ As to the monthly payment amounts, it is true that the exhibits reflect that initially the parties may have contemplated a monthly payment of $300. However, the documents also support a finding that Decedent accepted payments, first of $250 per month, and later at $300 per month. To illustrate, Decedent by original handwriting in his records, recorded that the "1992 payments [were] paid up" by monthly installments of $250. Later, on a page bearing Decedent's original handwritten additions, he

**4.** In reaching our conclusion, we do not ignore an error in the legal description which the trial court incorporated in its judgment by reference. Specifically, the judgment recites that the "subject matter of the contract is the real estate described in paragraph 3 of Count I of the Petition." The referenced paragraph in Plaintiff's petition describes the 19.73–acre tract as being in Range 26. The evidence adduced, including Decedent's tax receipts, shows that the 19.73–acre parcel lies in Range 28 in Lawrence County, Missouri. We take judicial notice of the fact that Lawrence County has no Range 26. Defendant never challenged exhibits "A" or "B" on the basis that they contained evidence that did not conform to the pleadings. We deem the pleadings to have been amended to conform to the evidence. Rule 55.33(b). Accordingly, we will remand to the trial court for correction of the judgment.

**5.** We do not ignore Defendant's claim that one document contained in exhibit "A" also references a sale price of $30,274. This figure is inconsistent with the total purchase price as calculated by multiplying 80 acres times $357 per acre. It is also inconsistent with the total amount that would be paid if the product of 80

acres times $357 per acre were paid in installments over a period of years with an interest rate of six percent. Upon examination of the context in which this figure appears, however, it is not surprising that Defendant fails to fully develop her argument with regard to this issue. The number (30,274) appears at the end of Decedent's handwritten notation "28560–1714 10Y1M + 24 = 30,274 total." The trial court could reasonably have viewed the figure "28560" as referring to $28,560. Simple arithmetic establishes that $28,560 is the product of multiplying 80 acres times $357 per acre. The trial court could also have concluded that the "1714" refers to six percent interest on $28,560 for one year, which would equal $1,713.60 or $1,714 when rounded off. Payments of $250 for 10 years and 1 month, or "10Y1M," total $30,250. We need not speculate on what Decedent was thinking as he made this notation or what comparisons he was trying to make. We do believe that, viewed in context, the court could reasonably have seen the $32,740 figure as confirming the sale price of $357 per acre for 80 acres and the six percent annual interest figure.

wrote that on the "starting date Jan.–1–1993" "revised payments" were to be at the "agreed sum of $300 per month." In any event, we view the method of payment, as opposed to the price, as one of the "matters concerning the performance of the contract which are usually found in such instruments and calculated to facilitate the attainment of its object" but which "may be left open for future specification without destruction of the contract or depriving a party remedy for its enforcement." *Wooster*, 270 S.W.2d at 751–52[10].

■ Defendant's next argument—mostly undeveloped—appears to be that the contract was fatally non-specific as to Plaintiff's promises because of writing that appears on page 7(a) of exhibit "A." On that page these phrases appear: "Defray the cross fence 'except drilling corner post holes' " and " Taxes ." We agree that read in isolation these words are non-specific and reveal little about the parties' agreement. Yet, other documents in exhibit "A" which refer to 80 acres for $357 per acre, also have this notation: "Cross fenced by Buyer & etc. Taxes due from Aug. 1–1992 to. . . ." From this data and the surrounding circumstances, the trial court could reasonably have found—as it did—that the parties agreed Plaintiff would build fence between the land he was buying and that which Decedent retained (except for drilling fence posts) and that Plaintiff would reimburse Decedent for real estate taxes that accrued beginning August 1992.

■ Continuing, Defendant argues that Decedent's promises regarding a water well were not sufficiently explicit to establish a contract. Defendant references a well agreement found in exhibit "B" which apparently contemplated that Decedent would pay for drilling a water well on the 59.5–acre parcel and that Plaintiff would repay Decedent at the rate of $50 per month. This argument ignores the fact that the water well contract was separate from the land purchase agreement, and that Plaintiff did not sue to enforce the former. A lien waiver accompanying the water well contract recites that the commencement date for that work was June 16, 1994, whereas the records show that the land sale contract commenced August 1,

1992. As for Defendant's argument that the "lien waiver contained in [Plaintiff's] Exhibit "B" refers only to the 59.5 acres, it is enough to say that the lien waiver described the land where the well was to be drilled, not the entire acreage.

■ In yet another argument, Defendant claims fatal uncertainty in the contract because "there is no reference in the documents as to [Decedent's] obligations . . . with respect to possession" or when Decedent was to execute a deed for the real estate. Defendant also claims that there was no evidence at trial that Plaintiff ever took possession. The latter argument mischaracterizes the record. Austin Barrett, the original personal representative, testified that Plaintiff "had moved some cars and things back there on the property" before Decedent died. The trial court was entitled to believe that testimony and reject any contrary evidence on that subject. *Kackley*, 947 S.W.2d at 466. In any event, details concerning possession and when the deed was to be executed were not details that were essential to creation of a valid written contract for the sale of land.

■ Defendant's argument that there was no showing that exhibits "A" and "B" "were connected by express reference to one another or by clear implication," borders on the frivolous. In her brief, Defendant concedes that the two exhibits are "virtually identical . . . with a few notable exceptions." When we compare the two exhibits, we find the differences are minimal and relate to matters that are not essential to an understanding of the parties' contract. Contrary to Defendant's argument, exhibits "A" and "B" are connected by clear implication established through their respective contents. *See Daewoo*, 770 S.W.2d at 456; *Mayer*, 660 S.W.2d at 748[4]. We reject Defendant's argument to the contrary.

As to Defendant's claim that the trial court's judgment was against the weight of the evidence, we note exhibits "A" and "B" contain more detail than other writings found sufficient to satisfy the statute of frauds. For instance, in *Wooster*, 270 S.W.2d 743, our supreme court found the following receipt sufficient:

" 'April 17, 1951

" 'Received of J.J. Ray the sum of $5000 in the form of a check as part payment on my farm known as Oak Hill Farm, including land, buildings, cattle and implements acreage 359 more or less the amount $33,-600.00

" 'Balance $28,600 payable on delivery title clear of any incumbrances.

" 'The term all cattle as of this date.

" 'The sum of $10.00 to be paid to B.F. Simpson for each calf on hand.

" 'A. M. Wooster

" 'Mrs. Vida S. Wooster.' "

*Id.* at 746. Unlike the documents here, the receipt in *Wooster* contained neither a legal description of the property nor a reference to its location, but merely described the land as "Oak Hill Farm." Even so, the *Wooster* court held that the designation of "my farm ... embodies the assertion of ownership—a fact which may be verified by resorting to public records." *Id.* at 750.

In *Seabaugh*, an even more cryptic memorandum was approved as satisfying the requirement of a writing. There, the seller, Ervin Voges, simply signed and gave to the buyer a receipt containing this recital:

"Received from Kenneth E. Seabaugh $1,000.00 cash as down payment on farm. Balance will be $54,000.000

185

300

55500

1000

54500"

679 S.W.2d at 925. In finding that the writing satisfied the statute of frauds, the court wrote: "The receipt indicates that Voges and plaintiff are the parties, the price is $55,-500.00 payable by a $1,000.00 down payment and a balance of $54,500.00." *Id.* at 926. The *Seabaugh* court answered appellant's claim that the property was not sufficiently described, with the observation that "the land in question" was "the only land that Ervin Voges owned." *Id.* at 926. Obviously, that fact came from evidence other than the receipt itself. Even so, the court found "[t]he description here, viewed in the light of all the evidence, is sufficient to satisfy the statute of frauds...." *Id.* at 926[5].

Relying on *Wooster* and *Seabaugh*, we hold that exhibits "A," "B," and "C" contain documents that are more than specific enough to satisfy the statute of frauds. The trial court's finding in that regard is amply supported by the evidence. Points II and III are denied.

*Points IV and V: Alleged Errors in Allowing Parol Evidence*

In Point IV, Defendant charges the trial court erred in "admitting parol evidence to prove the specific terms of the contract ... by permitting said parol evidence without first requiring evidence of part performance." Her fifth point is similar in that she charges reversible error in the granting of specific performance based on a finding that Plaintiff had partly performed the contract. Defendant argues that such finding, i.e., part performance, is against the weight of the evidence since the record clearly shows that Defendant did nothing to perform the contract other than pay money.

To develop these arguments, Defendant relies on the general rule that it is only after part performance under an oral contract is established that the party asserting the existence of the contract may introduce parol evidence of the verbal terms of the contract. *Ahrens v. Dodd,* 863 S.W.2d 611, 614[7] (Mo. App.1992). *See Jones v. Linder,* 247 S.W.2d 817, 820 (Mo.1952); *Emmel v. Hayes,* 102 Mo. 186, 14 S.W. 209, 211 (Mo.1890). Defendant relies on an attendant rule that "part payment of consideration alone is not sufficient 'part performance' to cause the specific performance of [an oral] contract." *Jones,* 247 S.W.2d at 824. *See Alonzo v. Laubert,* 418 S.W.2d 94, 97 (Mo.1967).

Defendant's arguments and authorities ignore the fact that the trial court decreed specific performance of a written contract, the terms of which were memorialized by documents in exhibits A and B. A party who seeks to enforce a contract for the sale of land need not show both a memorandum sufficient under the statute of frauds *and* part performance of the agreement. If sufficient writing exists to establish the es-

sential terms of a contract, the statute of frauds is satisfied. *See, e.g. Wooster,* 270 S.W.2d 743; *Seabaugh,* 679 S.W.2d 924. In that event, the proponent of the contract needs go no further. On the other hand, if the writing is insufficient or one does not exist, a party may avoid the bar of the statute if he has performed acts that are evidence of the existence of a contract to convey. *Ahrens,* 863 S.W.2d at 614[6]. Under this alternative "equitable avoidance" theory, the acts of part performance must have been done in reliance on the contract, and the positions of the parties must have been so materially changed that it would have been grossly unjust to allow the other party to rely on the statute of frauds. *Id.*

■ Whatever may be the correctness of the rules that Defendant urges about the order and quantum of proof needed to obtain specific performance of an oral contract under the "equitable avoidance" doctrine, those rules simply do not apply here. This follows because this court agrees with the trial court's finding that the exhibits satisfied the statute of frauds. Thus, there exists a tenable basis upon which to affirm the trial court's judgment. We must affirm a trial court's judgment if the result is correct on any tenable basis. *Brown v. Mercantile Bank of Poplar Bluff,* 820 S.W.2d 327, 334[2] (Mo.App.1991).

■ Under the circumstances, the trial court's findings about part performance are surplusage and any opinion by this court regarding such findings would be merely advisory. Appellate courts do not render advisory opinions or decide nonexistent issues. *See Air Evac EMS, Inc. v. Goodman,* 883 S.W.2d 71, 74[3] (Mo.App.1994); *In re Marriage of DuBois,* 875 S.W.2d 223, 226[2] (Mo. App.1994). It is for this reason that we refrain from deciding Points IV and V.

*Point VI: Trial Court Error in Granting Specific Performance*

Defendant's sixth and final point reads:

"The trial court erred in granting specific performance on the contract in that the court's relief was against the weight of the evidence because the subject matter, consideration, price and mutual promises were not proven by clear and convincing evidence and the trial court further erred in granting specific performance ... in that the court's relief misapplied or misdeclared the law by failing to find that the contract was fair and not unconscionable, as required by law."

The foregoing point and Defendant's argument in support are an attempt to rehash the points and arguments already disposed of in this opinion. We need not address such arguments again. Moreover, most of the cases Defendant has cited are not on point. They deal with oral contracts and discuss the proof required to avoid the statute of frauds on equitable principles. The contract at issue here is in writing.

■ One new argument that is in Point VI concerns a notation at page 23 of exhibit "A." This notation reads "$1200 went on short." Plaintiff testified that "short" did not indicate interest, but he had no explanation about its meaning. Decedent's daughter testified that during Decedent's lifetime, she tried to assist him in formalizing this transaction by preparing a written contract. Although her version of the contract was never signed or presented, the daughter testified that the phrase "$1200 went on short" meant that Plaintiff was to pay interest beginning in 1974, not 1992.[6] Defendant argues that the daughter's testimony on this subject reveals yet another ambiguity in the contract purchase price, thereby again demonstrating trial court error. Again, we disagree. Such an argument ignores the many other notations in exhibit "A" and "B" written by Decedent to the effect that the contract began "August 1992." Moreover, the daughter's testimony regarding the meaning of the "$1200 short" phrase need not have been believed by the trial court. *Seabaugh,* 679 S.W.2d at 927.

■ As to the final prong of Defendant's sixth point, it is true that specific performance of a *written* land contract may be withheld if the contract is inequitable,

---

6. Decedent first bought this land in 1974. Since Decedent sold the land to Plaintiff at his 1974 cost, the daughter insisted Decedent wanted interest from that earlier time.

results in an unconscionable bargain, or produces unfairness. *See Tuckwiller v. Tuckwiller,* 413 S.W.2d 274, 278 (Mo.1967). Relying on this principle, Defendant characterizes the $357 per acre price as "shockingly inadequate consideration" that compels a finding of unconscionability and the denial of specific performance. This argument overlooks the fact that Defendant pled unconscionability of contract as an affirmative defense but adduced no evidence at trial concerning the value of the land. Defendant's assertion of unconscionability of contract as an excuse for nonperformance is clearly an affirmative defense in that it is "a defense resting on facts not necessary to support plaintiff's case." *Wilson v. Motors Ins. Corp.,* 349 S.W.2d 250, 253 (Mo.App.1961). As with any affirmative defense, Defendant had the burden of proving that the contract was unconscionable, including any alleged price inadequacy. *See Mochar Sales Co. v. Meyer,* 373 S.W.2d 911, 914[2] (Mo.1964). This record is devoid of any evidence on what the land was really worth; consequently, Defendant's unconscionability defense is unproven.

■ Additionally, Defendant's argument ignores the fact that "a specific interest in land is unique ... and 'mere inadequacy [of consideration] is not a ground for refusing the remedy of specific performance; in order to be a defense, the inadequacy must either be accompanied by other inequitable incidents, or must be so gross as to show fraud.'" *Miller v. Coffeen,* 365 Mo. 204, 280 S.W.2d 100, 103[5] (banc 1955) (citation omitted). Defendant failed to present any evidence demonstrating "other inequitable incidents." Likewise, Defendant failed to offer any evidence regarding the fair market value of the property at the time of the sale. Consequently, there is no evidence to support a determination that the transaction rose to the level of fraud. We deny Defendant's sixth point.

The judgment is affirmed except to the extent that the judgment misdescribed part of the land as being in Range 26 when the evidence established that it is in Range 28. Accordingly, the case is remanded with directions to the trial court to correct its judgment as indicated.

MONTGOMERY, J., and GARRISON, C.J., concur.